[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10270
_____

D.C. Docket No. 2:12-cr-00005-JES-CM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus

JEFFREY R. GREEN,

Defendant-Appellant
Cross-Appellee,

KAREN S. HEBBLE,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(April 7, 2016)

Before HULL, JULIE CARNES and BARKSDALE,* Circuit Judges.

HULL, Circuit Judge:

After a jury trial, defendants Jeffrey Green and Karen Hebble were each convicted of one count of conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846; and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  As objects of the latter conspiracy, defendants Green and Hebble together were convicted of two counts of money laundering and defendant Green was separately convicted of four additional counts of money laundering, all in violation of 18 U.S.C. §§ 1957 and 2.  After review and with the benefit of oral argument, we affirm.

## I.  PROCEDURAL HISTORY

On July 24, 2013, a grand jury returned a superseding indictment against the defendants charging them with (1) conspiracy to distribute controlled substances, (2) conspiracy to commit money laundering of the proceeds of that illegal distribution, and (3) multiple money laundering counts for individual monetary transactions involving those drug distribution proceeds.  The indictment also sought forfeiture of various assets.

_____

*Honorable Rhesa H. Barksdale, United States Circuit Judge for the Fifth Circuit, sitting by designation.

2

Before trial, the defendants filed a joint motion to sever with each offering independent reasons for severance. Specifically, defendant Hebble argued that if the court severed their trials and if Green were tried first, then Green would provide exculpatory testimony on Hebble's behalf at her trial. The district court denied the defendants' motion, rejecting both defendants' independent arguments. Defendant Hebble renewed her motion to sever at the close of the government's case, and the district court again denied her motion.

The jury's verdict convicted the defendants on all counts. Post-trial, the defendants renewed their motion for judgment of acquittal, which they had timely made at the close of the government's case. The district court denied the motion.

The defendants subsequently moved for a new trial or alternatively for dismissal on the basis that the government had engaged in "selective prosecution," in violation of their Fifth Amendment Due Process Rights. The district court denied the motion and rejected the selective prosecution claim as improperly raised and untimely.

On appeal, the defendants challenge the sufficiency of the evidence supporting their convictions as well as the district court's rulings denying their selective prosecution claim and defendant Hebble's motion for severance. Because the defendants challenge the sufficiency of the evidence, we first review the evidence presented at trial.

## II.  TRIAL EVIDENCE

Defendants Green and Hebble ran two businesses, the Gulf Coast Medical Pharmacy and the Gulf Coast Infusion Center (collectively "Gulf Coast"), out of a small suite in a medical building near the Gulf Coast Medical Hospital in Lee County, Florida.[1]  Defendant Green owned and operated Gulf Coast.  Green was also registered as a pharmacist technician under Florida law, but he was not a pharmacist himself.  Green's then-fiancée, defendant Hebble, functioned as the store manager for the two businesses.

The lion's share of Gulf Coast's business consisted of oxycodone sales, a Schedule II narcotic and controlled substance with a high degree of addiction and abuse potential.  In 2009, Gulf Coast purchased 475,900 pills of oxycodone from pharmaceutical distributors for retail sale.  In 2010, that figure rose to 1,486,200 pills.  By 2011, Gulf Coast purchased 2,059,700 pills.[2]  By comparison, from 2009 through 2011, all other independent pharmacies within Gulf Coast's 33912 zip code area (about ten total) collectively purchased one-third the volume of

---

[1]The infusion center part of Gulf Coast was used for compounding special order medications for doctors' offices or other such purposes.  The infusion center, which lacked a controlled substances license, generated very little income percent-wise compared to the retail pharmacy side of Gulf Coast, which was licensed for controlled substances.

[2]These numbers include 15 mg and 30 mg dosages of oxycodone, for which the defendants required cash payment.  Gulf Coast also bought other dosages of oxycodone, which are not included in these numbers.

oxycodone as Gulf Coast purchased.  The average purchase volume of oxycodone

for pharmacies nationwide in 2010 was approximately 69,000 pills.

Gulf Coast proved to be very lucrative.  Gulf Coast's policy was that, while

customers could purchase other medications using insurance, customers could not

use insurance to purchase oxycodone; they had to pay in full with cash, credit card,

or debit card.  Most paid in cash.  Gulf Coast charged between $250 and $500 for a

typical oxycodone prescription.  For Roxicodone, a more expensive name-brand

version of oxycodone, Gulf Coast charged between $800 and $900 per

prescription.  In 2011 alone, the pharmacy filled 15,400 oxycodone prescriptions.

The result: Gulf Coast frequently brought in $15,000 to $28,000 per day per

register in cash-only sales.

Gulf Coast maintained multiple bank accounts over which defendants Green

and Hebble were co-owners and co-signers.  From January 2010 through October

2011, over $3,500,000 in cash was deposited into just one of those accounts alone.

Among other things, Green and Hebble used this money to pay their mortgage and

later to fully pay off their home, pay off student loans, pay for a $25,000 diamond

ring, and pay Green a $100,000 "getting married bonus."

But on November 4, 2011, all this came to a halt when the Drug

Enforcement Agency ("DEA") raided Gulf Coast and seized evidence related to

the defendants' illegal drug distribution conspiracy.  We recount the details of that conspiracy.

## A.    Central Florida's Underground Oxycodone Market

At trial, the government presented numerous witnesses who described how the Central Florida underground oxycodone market worked.  The system operated through the participation of a number of players including drug dealers, fake patients, and cooperating doctors and clinics.  One other key participant in the market was pharmacies, which ultimately supplied the controlled substances that would later be sold on the streets.

First, drug dealers, known as "sponsors," recruited and paid drug addicts or people otherwise desperate for money, called "spuds" or "skidoodies," to pose as fake patients.  Having recruited a group of fake patients, drug dealers would then shuttle them to and from several clinics a day with the goal of obtaining multiple oxycodone prescriptions for each fake patient.

Drug dealers targeted clinics that were willing to write numerous prescriptions for controlled substances for patients who had no medical need for these drugs.  Participating doctors frequently performed superficial examinations on fake patients, sometimes only lasting a few minutes.  Some clinics had superficial drug screening procedures in place.  Often, if a fake patient were likely to fail a drug test while at the clinic, a drug dealer or fake patient could pay extra to

6

avoid a failed drug test. Some clinics required that the fake patients have MRIs before they would write prescriptions; in such cases, the drug dealers would first take the fake patients to radiology clinics that were willing to create MRIs falsely showing back injuries before taking the fake patients to get their prescriptions.

Drug dealers could also pay extra for "VIP treatment," which allowed their fake patients to skip ahead in line—a thousand dollars, for example, could "put them right in the doctor's lap." Routinely doctors at these clinics wrote dozens of nearly-identical prescriptions for fake patients. These "cocktail" prescriptions typically were for oxycodone in two different strengths and another accompanying drug. With prescriptions in hand, the drug dealers would take their fake patients to pharmacies like Gulf Coast to have those prescriptions filled. Finally, drug dealers would then sell these controlled substances on the street.

As a controlled substance, oxycodone cannot be obtained without a prescription. And due to increasing scrutiny on the part of the DEA and other regulators between 2009 and 2011, many pharmacies became less willing to fill oxycodone prescriptions or would do so only with careful dispensing procedures in place.

One drug dealer, David Massey, admitted that he recruited 60 to 70 fake patients to illegally obtain oxycodone. First, Massey would take fake patients to doctors at "east coast" clinics to have them write prescriptions. Then, he would

7

have those prescriptions filled at one of several pharmacies, including Gulf Coast. When filling prescriptions at Gulf Coast, Massey typically took two to four fake patients at a time, and he would give defendant Hebble identification and cash for the whole group. Massey would never hand any money to his fake patients until all transactions were fully complete because he was "just using their bod[ies] and their identification."[3] Massey purchased both oxycodone 30 mg and oxycodone 15 mg from Gulf Coast, and he could easily spend over $400 for each prescription. With drugs in hand, Massey could then sell in bulk, perhaps $700 to $1,000 per 100 pills, and make "a quick $9,000" in total profit from a full day's work. At trial, Massey explained: "I like to quick flip. That's why I got into the oxycodone business. I ain't selling in singles."

Another drug dealer, Willie Hayden, testified that he used Gulf Coast and another pharmacy because they were the only ones that accepted prescriptions from east coast doctors. Hayden learned from defendant Hebble of a more expensive brand of oxycodone, called "real Roxicodone," that he could in turn sell for more money. Hayden went ahead and purchased a supply from Gulf Coast.

---

[3]On appeal, the defendants assert the trial record shows that "Massey's testimony went from bringing someone to the pharmacy 'every other day' on direct examination to 'once or twice' in total on cross." The context of Massey's answers on cross-examination make clear that there were only a few dates when Massey both took fake patients to Gulf Coast and filled a prescription for himself. However, Massey explained there were many dates when he took fake patients to Gulf Coast but did not fill prescriptions for himself.

Sometimes defendants Green and Hebble would wait after hours for customers upon special request, even without a pharmacist present. That was true in Hayden's case. Defendant Hebble, along with defendant Green, would wait for Hayden after hours to fill his prescriptions if Hayden called ahead of time. Hayden would ask, "Do you have any pills?" and defendant Hebble would answer, "Yeah . . . . Hurry up and get [here]."

Terrence Taylor, yet another drug dealer, typically took between 50 and 65 people per month to doctors to get oxycodone prescriptions. Taylor first met defendant Green at Gulf Coast in 2009 while having an oxycodone prescription filled. He frequented Gulf Coast regularly, often seeing Hebble. Taylor would always call ahead to make sure that Gulf Coast had enough drugs, and he would notify defendant Hebble, or whomever answered the phone, that he had "six or seven people" with him who had carpooled.

Another drug dealer, Christopher McNaughton, explained about Gulf Coast that "[i]f you didn't get there early enough, you probably weren't going to get your script filled." This was because there could be 75 people waiting in line. McNaughton, however, said that he "got to know Karen [Hebble]" and received his "pills faster than everybody." On two occasions, McNaughton asked defendant Hebble whether he could get extra oxycodone pills, known as "recyclables" (prescriptions for others that had not been picked up). Defendant Hebble obliged.

9

Hebble even gave McNaughton pills in a white envelope "in advance" before he had his prescription.

Kimberly Moore described her experience shuttling carloads of people to east coast doctors to have prescriptions written, and then to pharmacies to have them filled. Moore took about two carloads per day to Gulf Coast about three times a week for about a year-and-a-half period. Moore mostly interacted with defendant Green. Green told her that while the DEA was cracking down on east-coast prescriptions, he would nevertheless "grandfather" Moore in.

One time, David Massey was caught with drugs at a hotel and was found with a "whole bunch of Gulf Coast pill bottles," after which he was arrested and appeared in the news for days. Later Massey came to Gulf Coast with "east coast prescriptions" to be filled. Defendant Hebble told Massey that she had seen him in the news and asked if he was alright. When Massey presented the "east coast prescriptions," Hebble declined; she explained that because the "east coast prescriptions" were now "hot," they were no longer taking them. However, defendant Hebble explained to Massey that he could "keep doing the same thing but [he had to] bring west coast prescription[s]."

At trial, several Gulf Coast employees described the red flags that marked Gulf Coast's clientele. One former intern[4] used such descriptors as "drug abusers," "strung out," "high," "real anxious or nervous," and "abnormal" to describe many of Gulf Coast's customers. These customers often pulled cash right out of their pockets to pay for their drugs. In the words of another former employee, "[i]t was crazy" how long the lines of customers were that frequently formed in front of the pharmacy before it opened in the morning. Gulf Coast could run out of oxycodone before they even started dispensing it depending on how many prescriptions were already dropped off. An employee recalled that one day, Gulf Coast's supply of oxycodone ran out. In response, Gulf Coast's customers were "[v]ery hostile . . . and aggravated and upset." Whenever oxycodone ever ran out, business would be slow, if there was any business at all.

Another Gulf Coast employee told of how one customer thought he was in a movie theater and tried to buy a ticket. The customer also had a prescription of oxycodone 30 mg and oxycodone 15 mg waiting to be picked up. The employee shared with defendant Green that she "didn't feel comfortable ringing [the customer] out" and "giving him his meds." Nevertheless, Green completed the sale. Another employee similarly told of how a visibly impaired customer spoke to Green, and Green then ordered the employee to fill the customer's prescription.

---

[4]This intern worked at Gulf Coast for only two weeks before quitting and contacting the DEA.

11

Yet another Gulf Coast employee said she would sometimes feel nervous around Gulf Coast's customers because of "the way the people looked, the way they would come in, how they would act." She observed, "They would be high. I would have people falling asleep at my counter . . . not remembering if they picked up their pills yesterday or today." The employee shared her concerns with defendant Hebble. In the employee's words, Hebble's response was to say: "[W]e don't judge our customers; even if they're high . . . they are acceptable to take their medication."

One fake patient, Jason Dudley, further corroborated others' descriptions about the overtly suspicious nature of Gulf Coast's customers. Dudley reported that Gulf Coast "had lines out the door," sometimes with 50 people in line, with "people on the phones . . . pretty much out in the open, saying: Hey, where can I meet you . . . I'm getting them now[?]" These customers did not appear to Dudley to be injured; rather, they "looked like a lot of gangbangers." That observation dovetailed with drug dealer Willie Hayden's description of the customers. Hayden noticed they had "track marks on their hand[s]," and would "slur when they talk[ed]." Dudley also reported that in the nearby bathroom, "there would be people doing pills right there on the countertop."

Sara Cogdill, an office manager at Commercial Medical Group ("CMG"), shared about the clinic/doctor side of the conspiracy. Cogdill was formerly a drug

12

dealer herself.  Cogdill explained that she hired doctors who were willing to increase pain medication for customers; she fired doctors who were not.  Cogdill explained to her physician staff why CMG needed to write prescriptions liberally: if patients did not get their prescriptions from CMG, then they would go to nearby clinics, and CMG would risk losing their customers' business.  As an incentive, Cogdill's clinic paid its doctors cash bonuses for writing more than 200 prescriptions in a day.  CMG was known for writing a lot of prescriptions for "240 Roxicodone 30 [mg], 90 Xanax, and 90 15 [mg]."  It always had "lines wrapped around the door," and most of its patients were "sponsored by somebody."

Cogdill told how defendants Green and Hebble came to CMG one day, bringing business cards and brownies.  Green and Hebble told Cogdill that Gulf Coast always had Roxicodone in stock.  CMG then made Gulf Coast one of its listed pharmacies for the benefit of CMG's customers, which meant that CMG would call Gulf Coast each morning to confirm that there were pills in stock and then disclose this fact to its customers.  Gulf Coast was "always pretty good about carrying the drugs that [CMG] needed."

Sometimes Cogdill called over to Gulf Coast and asked to speak with defendant Hebble, and sometimes Hebble would call CMG.[5]  At trial, Cogdill explained the importance of keeping a business like Gulf Coast "at the top of [CMG's] list."  Cogdill put it this way: "[W]hen your patients come in, you know where to send them.  Because if they can't get the drugs, there's no need for us [CMG].  And we want them to get their drugs because we want to make the money."

One time defendant Hebble called Cogdill to let CMG know that Gulf Coast was out of 30 mg pills and requested that CMG instead write prescriptions for 15 mg.  But Gulf Coast rarely called CMG to verify the validity of prescriptions despite the number of patients CMG sent Gulf Coast's way.  Cogdill would call Hebble "[i]f there was an issue."  One time Cogdill called Hebble because a customer, accompanied by a "big sponsor," came in with an expired license.  CMG sent the drug dealer to Gulf Coast, which filled the prescription.

Another clinician, Dr. John Legowik, told about a clinic he ran, Physicians Wellness Center, that also served Gulf Coast.  In running the clinic, Dr. Legowik partnered with a man who turned out to be an "ex-con" drug dealer.  Dr. Legowik went ahead and prescribed his patients medication, primarily oxycodone and

---

[5]On cross-examination, Cogdill admitted that at the time she first told authorities about defendants Green and Hebble (after having been arrested herself), Cogdill could not remember Green's and Hebble's names.  Instead, Cogdill told authorities that she had interacted with "a man and a woman from Gulf Coast."

Xanax, that his patients did not need.  Dr. Legowik testified that he did it for the money.

Defendant Green visited Dr. Legowik's clinic several times.  Green would bring pastries and lunch, and he passed out Gulf Coast referral cards to the patients in Dr. Legowik's clinic.  Dr. Legowik's clinic, in turn, displayed those referral cards for several years.  After Green's visits, Physicians Wellness Center referred patients specifically to Gulf Coast.

At trial, some doctors whose prescriptions were filled at Gulf Coast testified on behalf of the defendants.  They explained that their prescriptions, often for a drug combination including oxycodone 30 mg and oxycodone 15 mg, were for a valid medical purpose and that Gulf Coast had called their offices to check their validity.

For example, Dr. Richard Amato explained that it can be appropriate to write a prescription that includes both oxycodone 30 mg and oxycodone 15 mg. Dr. Amato also said that his clinician staff reported that Gulf Coast had called to verify some of the prescriptions that Dr. Amato had written.  Dr. Amato, however, had inherited many patients who were used to receiving combination oxycodone prescriptions and was trying to wean them off and transition them to other medications.  Often when Dr. Amato did wean patients off combination oxycodone prescriptions, they left and stopped going back to Dr. Amato.  During a five-month

span in 2011, Dr. Amato wrote 874 prescriptions that were filled at Gulf Coast. When Gulf Coast did call to verify that a patient had indeed been to Dr. Amato's clinic, Dr. Amato was not sure whether a pharmacist or someone else from Gulf Coast called.  That is because Dr. Amato's staff always took those calls; Dr. Amato never personally verified with Gulf Coast the validity of any of his prescriptions.

Dr. Robert Hull, a doctor at Dr. Legowik's clinic, Physicians Wellness Center, also wrote prescriptions that were filled at Gulf Coast.  Dr. Hull  explained that he only prescribed narcotics like oxycodone when patients presented "hard evidence" of pain or injury, like x-rays or MRIs.  Dr. Hull affirmed that all of the prescriptions he wrote were issued in the ordinary course of his medical practice and for legitimate medical reasons.  Dr. Hull, however, admitted that he never personally spoke with anyone at Gulf Coast to verify the medical legitimacy of any of the prescriptions he had written.  Also, Dr. Hull explained that he would refuse to write prescriptions for people who had DUIs, felonies, or otherwise sold drugs. Consequently, he "was fired after a very short time of being at . . . Physicians Wellness Center."[6]

---

[6]Another doctor, Dr. Emiliya Hill, also testified on behalf of the defendants.  She offered similar testimony to that of Dr. Amato and Dr. Hull that there could be a medical reason for prescribing oxycodone and that she personally took steps to fully examine her patients before writing oxycodone prescriptions.

### B.    Gulf Coast's Pharmacy Standards

At trial, through numerous witnesses, the government presented evidence of Gulf Coast's pharmacy standards including evidence about its pharmacists and how they were used.  A few of Gulf Coast's pharmacists even shared their own perspectives and experiences working at Gulf Coast.

Robert Mahan was Gulf Coast's "pharmacist of record."  Mahan, an elderly man in his mid-eighties, was described as "very ill," confined to breathing with the help of an oxygen tank, and reportedly it was "difficult for him to speak and stand."  One Gulf Coast employee said she never saw Mahan fill a prescription or give a patient medical advice.  Mahan "was never really there," and sometimes "would just come and open the pharmacy and leave" if defendants Green or Hebble were on vacation.  Because Mahan frequently was not around, defendant Green would typically sign Mahan's name to prescriptions and other paperwork.

Another Gulf Coast pharmacist in his eighties, Robert Rowe, often sat or slept in a corner while at work.  One time, a Gulf Coast employee asked Rowe to look at a prescription.  Rowe responded: "I'm not to check prescriptions, I'm paid to sit in this chair."  Rowe told one Gulf Coast employee that he "[didn]'t talk to doctors."  Instead, Rowe had been hired "just so [Gulf Coast] had an active license."  If a customer had questions about medications, defendant Green—not Rowe—would answer those questions.

17

At trial, Rowe himself testified.  He explained that defendant Green hired him to sit in a corner and "watch the pharmacists filling their prescriptions." Though his job was to watch the pharmacists, Rowe admitted that he was not sure who were pharmacists and who were merely technicians—he "didn't question them."  Rowe himself "was not hired as a pharmacist," and he "was not paid as a pharmacist" either.  Rowe said that he "never filled one prescription."  Rowe knew Gulf Coast was distributing controlled substances, but he did not know which ones. He "never looked at the [prescriptions]."  Though pharmacy law, according to Rowe, required that prescriptions be "cancelled when they're filled," they often were not; instead, at the end of the day, he would be handed a stack of prescriptions.  He would sign them then.

Pharmacist Eddie Becker told of his experience working at Gulf Coast, which differed markedly from his prior experience working at a Wal-Mart pharmacy.  At Wal-Mart, Becker found that the pharmacy was busy, filling lots of prescriptions, but these tended to be for drugs other than controlled substances.  At Gulf Coast, Becker "was astonished at the amount of medications for controlled drugs that were filled."  Ninety percent of the prescriptions for which Gulf Coast's customers lined up were for oxycodone and typically for a set drug combination— "[y]ou didn't see too much . . . regular medication coming in."  At Wal-Mart, when controlled substance prescriptions did come through, most of the time the

18

pharmacists did not fill them, and for those prescriptions that were filled, they were done so case-by-case based on the pharmacist's discretion. In contrast, at Gulf Coast, Becker was surprised at how many of the controlled substance prescriptions "were almost the same" and that they were all being filled. At Wal-Mart, Becker recalled that the average customer's age tended to be around 50 or 55. At Gulf Coast, customers were typically in their twenties or thirties.

All in all, things were nothing like what Becker had expected when he took the job at Gulf Coast. Becker said that sometimes he would arrive for work in the morning to find the pharmacy door already opened (it was not supposed to be without a pharmacist present). Becker was often met by long lines of customers; he "almost had to fight [his] way through the line to get into the door."

At one point Becker shared with defendant Green his concern for the "humongous quantity" of controlled substances Gulf Coast was filling and that such volume was "sending up red flags" in Becker's mind. Defendant Green responded to Becker: "[T]his is what our business is." Becker shook off his concerns because he needed a job, and Green assured Becker that "everybody"— that is, law enforcement—"knew what [Green] was doing and they said he was doing a great job." That satisfied Becker.

Another time, Becker heard defendant Green talking to one of Gulf Coast's suppliers. As background to this conversation, the evidence showed that Gulf

19

Coast was fully consuming its monthly allotment of oxycodone, causing its supplier to cut off Gulf Coast's supply four or five days before the end of the month. That would cause Gulf Coast to lose sales because it would have to redirect its customers elsewhere to get their oxycodone. Becker heard Green tell the supplier's representative that Gulf Coast was "an outpatient pharmacy from the hospital" and was "filling a lot of outpatient" prescriptions from there. The supplier soon increased Gulf Coast's daily oxycodone supply from 5,000 pills per day to 10,000. According to Becker's account, though, Gulf Coast was simply a "privately-owned retail pharmacy that happened to be located in a building close to the hospital." It only served outpatient hospital patients when they "wandered over that way." Thus, by stating that Gulf Coast was the hospital's outpatient pharmacy that filled many of its outpatient prescriptions, defendant Green had misled the supplier in order to increase its oxycodone supply.

Given this backdrop at trial, the government called expert witness Robert Parrado to testify about Gulf Coast's standards of professional practice. Parrado was a licensed pharmacist of 43 years who had worked extensively in both chain and independent pharmacies and had served as Chairman of Florida's pharmacy licensing board. Parrado discussed both the legal and professional duties for which a pharmacy, like Gulf Coast, is responsible and the ways in which Gulf Coast disregarded those duties.

20

Parrado explained that a pharmacist's role is to dispense medication for only valid prescriptions, which are prescriptions "written by a physician in the normal course of his professional practice" and "for a legitimate medical purpose." To "determine if a prescription is written for a legitimate medical purpose," a pharmacist must "evaluate any red flags" that arise when a customer attempts to fill a prescription.

To investigate red flags, a pharmacist must personally call the prescribing physician to determine if a given prescription is valid, and only a pharmacist can do so. Parrado explained that a pharmacist "cannot dispense the prescription until the red flags have been . . . resolved." Aside from investigating red flags, Parrado explained that pharmacies have various record-keeping responsibilities for the prescriptions they fill, which include logging patient contact information; type, strength, and quantity of medication; and physician information. Pharmacists must verify the accuracy of this information.

Parrado explained that while pharmacy technicians may assist pharmacists with certain routine tasks, pharmacy technicians may not themselves fill or dispense prescriptions. Witnesses testified that at times, Green, a pharmacy technician, and Hebble, a business manager, both personally filled prescriptions at Gulf Coast. Parrado also testified that pharmacy technicians may not call a prescribing physician "to check on anything of a clinical basis" for purposes of

21

filling a prescription.  With controlled substance prescriptions, the pharmacist must personally sign the prescriptions.

In Gulf Coast's case, Parrado discussed the "very large quantity of red flags" he found when reviewing Gulf Coast's records and the prescriptions it had filled. Frequently in the case of Gulf Coast's prescriptions, there was a long geographic distance between the prescribing physician's office and Gulf Coast.  Also, law enforcement had periodically requested information about particular patients, which should have been a red flag to Gulf Coast that these patients or their prescribing physicians were under investigation.

Additionally, Gulf Coast had filled numerous prescriptions that dispensed a very high dosage of two immediate-release opioids like oxycodone 30 mg and oxycodone 15 mg, a prescription for which "[t]here is no medical purpose."[7] There were "multiple prescriptions for large quantities of these drugs given to people presenting at the same time, coming in together," which, for Parrado, was "almost a non-resolvable flag."  Parrado testified that this is because duplicitous prescriptions written by the same physician indicate a lack of "individualization of therapy."

---

[7]At trial, some witnesses disagreed with Parrado's opinion.  Pharmacist Becker of Gulf Coast and several doctors testifying on behalf of the defendants offered reasons why it might be medically legitimate to prescribe oxycodone 30 mg along with oxycodone 15 mg.

One example of Gulf Coast's filling of duplicitous prescriptions involved a stack of prescriptions written by a Dr. Rothenberg. Dr. Rothenberg had written over one hundred oxycodone prescriptions in a single day, which was a red flag Parrado could not "resolve." These were "identical prescriptions" of "very similar dosing . . . for multiple people, some of . . . which presented at the same time." Gulf Coast went ahead and filled these prescriptions over a two-day span. Parrado saw no evidence that Gulf Coast had verified the validity of each of these prescriptions, as they were required to do.

Parrado was also asked about the testimony that one of Gulf Coast's pharmacists had given earlier in the trial. Pharmacist Rowe had admitted that he never checked or filled any prescriptions. Parrado explained that for any of the prescriptions Gulf Coast filled bearing Rowe's signature, they would have been "diverted" rather than "dispensed." In other words, such prescriptions "were not handed out to a patient who really had a valid prescription." Parrado offered an analogy to illustrate his point: "This is the same as a person coming in and getting some controlled substances off the shelf, putting them in a bottle and selling them, because there is no pharmacist intervention in there. So that's diversion."

The defendants countered the testimony by Parrado by pointing to evidence of Gulf Coast's security measures and policies they maintained were intended to prevent diversion of controlled substances for illicit means. For example, when a

23

patient would attempt to fill a controlled substance prescription, the person working the cash register would take the patient's prescription and collect the patient's identification information including name, address, driver's license or ID number, and date of birth.  Next, the prescription would be handed to someone in the dispensing area, and either a pharmacist or a pharmacy technician was supposed to call the clinic or doctor's office that wrote the controlled substance prescription to verify that the patient's identifying information matched and that the doctor had indeed written that prescription for the patient.  Having verified the prescription, pharmacy staff would then print labels, count out and bottle the pills, and finish by entering information about the transaction into a computer system.  If the computer records for a patient displayed a warning message, such as "Do not fill per sheriff" for example, then Gulf Coast might decline to fill the prescription. When the patient picked up the filled prescription, Gulf Coast would ask for ID and have the patient sign a log showing the patient had picked up the medication.

There was also some testimony suggesting that Gulf Coast employees had discretion to refuse to fill prescriptions for which they had concerns.  There were occasions where Gulf Coast had refused to fill a prescription.  For example, one technician said that eventually Gulf Coast stopped filling prescriptions written by Dr. Rothenberg.  And one time, Gulf Coast discovered that a patient had altered her Adderall prescription, so it held the patient's ID until law enforcement came to

24

remove her. Pharmacist Becker testified that, despite his concern for the large quantity of controlled substances being dispensed, he was not ultimately concerned because Gulf Coast "went through a routine" to call the prescribing doctor's office to verify the accuracy of the prescription's information. Defendant Green frequently cooperated with the DEA when it was investigating customers that had filled controlled substance prescriptions through Gulf Coast, and, for a time, Green hired off-duty law enforcement officers to maintain an orderly environment.

However, there was plenty of evidence that undermined the defendants' favorable evidence and instead showed that Gulf Coast either did not have procedures in place to genuinely guard against the red flags that Parrado highlighted or else the procedures it did have were simply a façade.

For example, fake patient Jason Dudley reported that whether Gulf Coast actually checked for identification depended on whether a law enforcement officer was present or not. Dudley reported that when an officer was present, "it looked like a regular pharmacy." But "[u]sually you'd never see [Green] unless the sheriff was there, and then [Green] was usually standing right there like he should." While Green solicited the help of off-duty law enforcement officers to be present at Gulf Coast for a time, this practice did not last long. A Gulf Coast employee testified that once customers began to be intimidated by the presence of an officer,

25

Green decided that any officers should remain outside, usually in their police vehicles.

Drug dealer Nicholas Smith, who typically paid either Green or Hebble in cash, said that one time he tried to hand Green money while an officer was present, and "[Green] frowned on it, telling [Smith] not to do it in front of the police." Another time, Smith tried to fill some prescriptions, and Green told Smith the prescriptions "weren't right," that either Smith could leave them and try again or Green would call the police. Smith left the prescription with Gulf Coast, came back the next day, and filled it; then "[e]verything was normal."

As for Gulf Coast's practice of verifying the validity of prescriptions, evidence showed that those efforts were designed to ostensibly comply with "basic requirement[s] of pharmacy law" without genuinely preventing the trafficking of controlled substances for illicit purposes. One Gulf Coast intern reported that Green instructed that for customers who had filled with Gulf Coast "a handful of times, odds are [the doctor's office is] going to okay it" and if Gulf Coast staff could not get through to the doctor's office, they should "just grandfather them in." Another employee reported that if a customer arrived after hours and only defendants Green and Hebble were present, there would be no calls made to verify prescriptions. Rarely would Gulf Coast speak with the prescribing doctor. Becker admitted that "[i]f there was a question as to whether the prescription was to be

26

filled because of some situation with the patient, . . . Mr. Green would have come over and . . . we would refer it to him."

## C.    Investigations

At trial, the government also presented evidence of numerous investigations performed by Gulf Coast's suppliers, culminating in the DEA's raid of Gulf Coast on November 4, 2011.

Around September 2010, Bill Stivers, compliance investigator at H.D. Smith, reviewed Gulf Coast's records. H.D. Smith is a wholesale pharmaceutical distributor and was one of Gulf Coast's suppliers. Stivers's job was to ensure compliance on the part of H.D. Smith's customers by making sure that they had access to a reasonable amount of pharmaceuticals and that those pharmaceuticals were being dispensed for a legitimate medical purpose.

Since 2007, Gulf Coast had maintained an inactive account with H.D. Smith. Then in 2010, Gulf Coast contacted H.D. Smith to open a new account. Investigator Stivers soon noticed that over 90% of the drugs Gulf Coast purchased were controlled substances, most of which were 30 mg or 15 mg doses of oxycodone. That prompted Stivers to block Gulf Coast's account around mid-September of 2010, preventing Gulf Coast from ordering more drugs. That discontinuance lasted until November 1, 2010, at which point Gulf Coast contacted an H.D. Smith sales representative, who reopened the account.

27

When investigator Stivers learned that Gulf Coast had been granted access to oxycodone again, he called Gulf Coast to schedule an on-site visit. He requested a copy of Gulf Coast's dispensing report, which ordinarily would provide a detailed accounting of every prescription filled at Gulf Coast for a certain time period, including the drug, quantity, prescribing doctor, and payment method.

Prior to the visit, investigator Stivers reviewed Gulf Coast's customer profile, which defendant Green had previously completed and signed. In that profile form, Green indicated that he understood that "[p]rescriptions can only be issued by a doctor acting in the usual course of their professional practice," and "[d]rugs dispensed pursuant to invalid prescriptions are deemed not for legitimate medical purpose, therefore, ILLEGAL." Green also stated in the profile that 20% of its purchases from H.D. Smith as well as all other suppliers were for controlled substances. The profile further stated that Gulf Coast's controlled-substance business was 10% cash.

On November 9, 2010, investigator Stivers visited Gulf Coast. During his visit, Stivers saw defendants Green and Hebble. He also noticed several Gulf Coast customers standing in line with cash in hand. They appeared impaired and lethargic with glassy eyes.

Investigator Stivers spoke with defendant Green. In response to Stivers's questions, Green shared that Gulf Coast filled about 300 prescriptions a day, that

40-50% of those prescriptions were for controlled substances, and that customers paid for those substances with cash about 20% of the time. Stivers found Gulf Coast's high volume of controlled substance prescriptions concerning—he testified that anything over 20% is reason for H.D. Smith to ask questions. During his visit, he counselled Green about guarding against fraudulent prescriptions.

After investigator Stivers left, Gulf Coast faxed him a "utilization record," not a dispensing report, which is what Stivers had specifically requested of defendant Green during the visit. The utilization record disclosed less information, omitting such details as the names of prescribing physicians or how the drugs were purchased. The report did show the number and types of prescriptions filled, but only for October 2010. Gulf Coast had filled over 900 oxycodone 30 mg prescriptions, totaling over 160,000 pills, and 585 prescriptions for oxycodone 15 mg, totaling over 52,000 pills.

Concerned with what he saw, investigator Stivers recommended to H.D. Smith that they stop supplying Gulf Coast. H.D. Smith then closed Gulf Coast's account.

In February 2011, investigator Donald Morse of Cardinal Health, Gulf Coast's biggest oxycodone supplier from 2009-2011, visited Gulf Coast to follow up on a prior visit and to investigate the reasons for Gulf Coast's increased purchases of controlled substances. In 2008, defendant Green filled out a

questionnaire for Cardinal Health.  That questionnaire stated that 10% of Gulf

Coast's revenue consisted of cash transactions (90% was Medicare, Medicaid, and

insurance) and 20% of Gulf Coast's prescription sales were for controlled

substances.  The questionnaire also stated that Gulf Coast was the "outpatient

pharmacy at Gulf Coast Hospital Lee Memorial."  Since 2008, based on requests

by defendant Green, Cardinal Health had increased Gulf Coast's supply of

controlled substances multiple times.

On February 17, 2011, investigator Morse met with defendant Green to

inquire into the reasons for Gulf Coast's increased controlled substance supply

requests.  Morse wanted to make sure that Gulf Coast was vetting its prescribing

physicians and customers to ensure that the prescriptions were for legitimate

medical needs.  Defendant Green offered several reasons for why Gulf Coast's

controlled substance demands had increased.

One reason was that a palliative care doctor named Andrew Esch had

recently opened a clinic nearby, and defendant Green told investigator Morse that

Dr. Esch planned to direct most of his patients to Gulf Coast.  Green produced a

letter from Dr. Esch stating as much.  But those plans never came to fruition, and Dr. Esch testified that he stopped sending patients to Gulf Coast.[8]

Defendant Green also explained that Gulf Coast filled prescriptions for nearby hospitals, and one such hospital increased in size from 110 beds to 480 beds.  As a final reason, Green told investigator Morse that Gulf Coast had a relationship with the sheriff's department.  Green explained that Gulf Coast filled prescriptions for the jail, and that Gulf Coast also filled prescriptions for all the palliative care and pain management programs at the nearby hospitals, which Dr. Esch oversaw.  Green explained that the sheriff's department supported the Gulf Coast-hospital partnership because it allowed for greater centralization for where controlled substance prescriptions were filled.

During the February 17 meeting, investigator Morse asked Green for documentation about the sheriff department's support for Gulf Coast's controlled substance business.  Such documentation, however, "was not forthcoming."[9]

A few months later, Cardinal Health's national pain-medication supplier, Covidien, began to investigate.  Floyd Ratliff was Covidien's chief security officer

---

[8]While Dr. Esch had intended to partner with Gulf Coast, he soon stopped directing his patients there.  Many of Dr. Esch's patients were Medicare or Medicaid patients, and defendant Green told Dr. Esch that Gulf Coast did not accept Medicaid patients.  Dr. Esch was also misled into thinking that defendant Green was actually a pharmacist.  Green had told Esch that he was, and even wore a lab coat with "Pharmacist, Jeff" embroidered on the jacket.

[9]After the defendants were arrested, in 2012 Cardinal Health was fined by the DEA for failure to sufficiently monitor certain pharmacies as to the distribution of controlled substances.

and a former FBI agent who had cross-trained with the DEA.  Ratliff examined Cardinal Health's records and learned that Gulf Coast was Covidien's largest oxycodone consumer nationally.  In the first nine months of 2011, Gulf Coast had received over 1.2 million 30 mg oxycodone tablets manufactured by Covidien.

Equipped with this information, Ratliff visited Gulf Coast on September 13, 2011.  When Ratliff arrived, he did not see a sign or anything indicating that there was a pharmacy inside the building.[10]  Then he drove through the parking lot to get a sense of the size of the complex and how many cars were present.  As he drove, Ratliff encountered a number of young people crossing the road to the parking lot.  Ratliff observed that these people appeared to know one another because they were talking to each other.  One "very obvious" thing Ratliff noticed was that "a number of people [were] kneeling down beside cars, talking to the people inside."  It appeared to Ratliff they were "transacting some type of business."  Ratliff did not see any elderly people, people with walkers, or people that appeared to be in pain.

Ratliff parked his car.  As he walked up to Gulf Coast, he noticed three young people standing in the lobby talking to one another.  As he approached, "they stood absolutely still and quit talking.  And they started watching [Ratliff]."  Ratliff observed Gulf Coast and the surrounding area for about 30 minutes.  His

---

[10]There may have been a nearby billboard advertising Gulf Coast, though the record is unclear.

visit was unannounced though, and he did not speak with anyone inside Gulf Coast.

Following his visit, Ratliff promptly recommended to Covidien that it stop supplying Cardinal Health with pills so as to cut off Gulf Coast's supply. Covidien also notified its other distributors via letter that they were to no longer supply Gulf Coast with Covidien's medications.

On November 4, 2011, DEA agents raided Gulf Coast pursuant to a search warrant. Defendants Green and Hebble were both present. The pharmacist present that day was Charles Krueger, someone one DEA agent described as appearing "very ill." During the search, between 20 and 40 customers arrived. Their prescriptions were typically for oxycodone 30 mg tablets, oxycodone 15 mg tablets, and another controlled substance. Such "cocktail" prescriptions were "red flags" for the DEA investigators. Gulf Coast had also posted a price list by the register listing that day's price for oxycodone: $1.50 per 15 mg pill, $2.00 per 30 mg pill, and prices for bulk quantities of these pills. The investigators, however, were not able to find any oxycodone 30 mg or oxycodone 15 mg in stock at Gulf Coast that particular day.

### III.  SUFFICIENCY OF THE EVIDENCE

On appeal, defendants Green and Hebble challenge the sufficiency of the evidence supporting their convictions, arguing they lacked mens rea. Specifically,

they argue that the evidence did not show that they knowingly filled invalid oxycodone prescriptions outside the usual course of professional practice and for other than legitimate medical purposes, or that they deliberately closed their eyes to circumstances that would have made them aware they were doing so.

## A.    Standard of Review

We review de novo a challenge to the sufficiency of the evidence to support a conviction, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." United States v. Taylor, 480 F.3d 1025, 1026 (11th Cir. 2007). "We will uphold a district court's denial of a motion for a judgment of acquittal if a reasonable trier of fact could conclude the evidence established the defendant's guilt beyond a reasonable doubt." Id.

To the extent the defendants' argument "depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination and we may not revisit the question." United States v. Hernandez, 743 F.3d 812, 814 (11th Cir. 2014) (quotation marks and alterations omitted). We will not disturb the jury's verdict "unless the testimony is incredible as a matter of law." United States v. Flores, 572 F.3d 1254, 1263 (11th Cir. 2009) (quotation marks omitted). Testimony is not considered incredible as a matter of law unless it is "unbelievable on its face," that is, "testimony as to facts that the witness could not

34

have possibly observed or events that could not have occurred under the laws of nature." United States v. Thompson, 422 F.3d 1285, 1291 (11th Cir. 2005) (quotation marks and alterations omitted).

## B.    Conspiracy to Distribute Controlled Substances

To prove a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, the government was required to prove: "(1) a conspiracy (or agreement) existed between Defendants or between Defendants and others; (2) Defendants knew the essential objects of the conspiracy, which are to do either an unlawful act or a lawful act by unlawful means; and (3) Defendants knowingly and voluntarily participated in the conspiracy." United States v. Westry, 524 F.3d 1198, 1212 (11th Cir. 2008).

In this case, the illegal objects of the conspiracy consisted of violations of 21 U.S.C. § 841(a)(1), which provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."[11]  21 U.S.C. § 841(a)(1).  Some individuals and entities are "authorized by this subchapter" to distribute controlled substances.  See, e.g., 21 U.S.C. § 822 (addressing registration and conditions governing the authorized distribution of controlled substances).  Accordingly, the

---

[11]Also cited in the conspiracy charge was 21 U.S.C. § 841(b)(1)(C), the penalty provision for violations of § 841(a)(1).

defendants were charged with conspiracy to distribute controlled substances outside the usual course of professional practice and for other than legitimate medical purposes.

The government asserts that the conspiracy charge included three objects: (1) possession with intent to distribute, (2) distribution, and (3) distribution outside the usual course of professional practice and for other than legitimate medical purposes. The jury verdict form shows that the jury found both defendants conspired to achieve all three objects of the conspiracy.

The government presented more than sufficient evidence to prove that defendants Green and Hebble conspired to achieve these objects, distributing controlled substances illegally by filling prescriptions of oxycodone for the benefit of numerous drug dealers and fake patients operating within an illegal controlled substances underground market.[12] The indictment charged that the defendants conspired with <u>others</u> and with <u>each other</u> to distribute controlled substances for an illegitimate purpose. The government needed to prove either that the defendants conspired directly with illegal controlled substance underground market participants, such as drug dealers or doctors, or that the defendants conspired with

---

[12]The government argues that in the defendants' brief, they challenge only the evidence supporting the jury's finding as to the "distribution outside the usual course" object of the conspiracy, otherwise conceding they possessed and distributed controlled substances. The government concludes that the defendants have thus abandoned any challenge to their conspiracy conviction predicated on the first two objects. We disagree and consider evidence of all three objects.

each other to avail themselves of that illegal market.  Here, sufficient evidence

supported all conspiracy objects.[13]

As for conspiring with others, a number of drug dealers testified that they

used Gulf Coast to fill their fake patients' bogus prescriptions, and defendants

Green and Hebble frequently served them.  For example, Willie Hayden knew he

could call Gulf Coast if he were running late, and the defendants would hold the

pharmacy open for him.  Hayden would double check that Gulf Coast had pills in

stock, and Hebble would confirm that it did.  Christopher McNaughton testified

that he "got to know" Hebble, and he received his "pills faster than anybody."

The jury also heard from prescribing doctors and managers of clinics, who

were the players responsible for churning out the prescriptions that fueled the

underground market.  They testified that Green and Hebble actively solicited

business from Sara Cogdill's and Dr. John Legowik's clinics, both of which

referred patients to Gulf Coast, which willingly accommodated their requests.  The

jury could have reasonably inferred that the defendants conspired with drug

---

[13]The government also argues that the jury's verdict should be affirmed because the defendants failed to prove that they were authorized to distribute controlled substances in the first instance.  The government argues that 21 U.S.C. § 841(a)(1) by default criminalizes the distribution of controlled substances and that the statute's "[e]xcept as authorized by this subchapter" language makes available an affirmative defense that a defendant has the burden of proving at trial (for example, that the defendant is a proper DEA registrant or that he fits within another safe harbor provision).  21 U.S.C. § 841(a)(1).

We need not decide whether and what all a defendant must prove to establish that he was authorized to distribute controlled substances because the evidence here is overwhelming that both defendants conspired to distribute controlled substances outside the usual course of professional practice and for other than legitimate medical purposes.

37

dealers, clinic staff, or both to distribute controlled substances outside the course of professional practice and for other than legitimate medical purposes.

There was also plenty of evidence showing that defendants Green and Hebble conspired with each other to distribute controlled substances, knowing that many of their customers were drug dealers or illicit users of drugs. Numerous government witnesses, including employees, customers, investigators, and the government's expert, described the many red flags the defendants should have easily noticed. They described the long lines of customers who flocked to Gulf Coast for oxycodone, many of whom plainly exhibited tell-tale signs of drug abuse. These customers usually paid in cash, and with drugs in hand, would often start transacting business right away with others on the phone or in the vicinity.

In addition to the readily observable characteristics and behaviors of Gulf Coast's clientele, a reasonable juror could conclude that the prescriptions themselves readily put defendants Green and Hebble on clear notice that many customers were filling their prescriptions for illicit use. Green and Hebble knew many customers were traveling long distances from the prescribing physician to fill prescriptions at Gulf Coast, and the defendants knew that a number of these "east coast" doctors were under the investigatory eye of the DEA. Green and Hebble's pharmacy routinely filled multiple cocktail prescriptions, sometimes written by the same doctor, for groups of people presenting at the same time at Gulf Coast. These

38

cocktail prescriptions were typically nearly identical, containing both 30 mg and 15 mg dosages of oxycodone.

There was also plenty of evidence from which the jury could infer that even a lay person, let alone someone with some amount of pharmaceutical expertise, could readily discern multiple red flags signaling illicit activity. The government's expert, Robert Parrado, explained that pharmacies faced with the kind of red flags springing up at Gulf Coast have a duty to investigate and resolve those red flags before dispensing controlled substances. But instead of diligently investigating those red flags, defendant Hebble instructed Gulf Coast's employees not to "judge [Gulf Coast's] customers; even if they're high," adding, "they are acceptable to take their medication."

While the defendants point to selected examples where Gulf Coast declined to fill a given customer's prescription, began turning away prescriptions from doctors who had developed a notorious reputation with law enforcement, or even cooperated with law enforcement in their investigations of select individuals, these instances are not conclusive proof of an innocent mind. Faced with abundant mens rea evidence, the jury was free to infer from these examples that the defendants were trying to execute their conspiracy shrewdly so that they would not easily be caught themselves.

On appeal, the defendants also argue that the policies and procedures they implemented at Gulf Coast, particularly their policy of verifying prescriptions, functioned as "fail safes" that prevented the defendants from knowing that a portion of the prescriptions Gulf Coast filled were derived from an illegal scheme perpetuated by drug dealers and participating doctors. The jury, however, was free to find these measures to be nothing more than a façade simply designed to convey the appearance of legitimacy. The jury heard examples where these measures were not enforced, such as when Gulf Coast would fill prescriptions for customers after hours with no pharmacist on duty or when defendant Green would sign pharmacist Mahan's name to prescriptions when Mahan was not around. One customer testified that whether Gulf Coast actually checked for identification depended on whether a law enforcement officer was present or not.

Even where Gulf Coast did follow its procedures though, including its prescription-verification procedure, the defendants do not explain how these procedures guarded against their dispensing controlled substances for an illicit purpose, which by definition is outside the usual course of professional practice. The jury could find that Gulf Coast's verification procedure was little more than a rubber-stamp measure designed to ensure that an actual doctor had actually written a given prescription. Given the evidence that the defendants either conspired directly with certain doctors who wrote illegitimate prescriptions or they at least

40

had reason to believe that the prescribing doctors were participants in an illegal scheme, Gulf Coast's verification policy did nothing to ensure that the prescriptions it filled were validly written for legitimate medical purposes. In fact, in some instances, verification may have confirmed that a suspect doctor had in fact written a given prescription. The defendants' argument that the prescriptions Gulf Coast filled were "valid on their face" and, in effect, provide them with a safe harbor from drug distribution conspiracy charges would necessarily shield the varied participants in any illegal controlled substance underground market so long as some licensed doctor signed the prescriptions. The jury was not compelled to attribute the weight the defendants do to Gulf Coast's procedures.

The defendants also offer many reasons why various government witnesses who testified, especially the former drug dealers, should not have been believed. For example, the defendants argue that Gulf Coast records undermine the testimony different drug dealers gave regarding the frequency with which they took fake patients to Gulf Coast to fill prescriptions. The defendants argue that some of these drug dealers were impeached at trial for failure to recall specific dates they went to Gulf Coast or the names of specific fake patients they took with them. The problem for the defendants is that the jury did not have to credit Gulf Coast's own store records over the drug dealers' testimony or find these drug dealers to be unbelievable for their failure to recall at trial specific dates and

names.  Most critically, the defendants have not pointed us to any examples of government witness testimony that were "incredible as a matter of law," Flores, 572 F.3d at 1263, and thus we will not disturb the jury's verdict on that basis, Hernandez, 743 F.3d at 814.

Defendant Hebble specifically argues that the evidence against her was comparatively weaker than the evidence against defendant Green because she was "merely a cashier and business manager and not a pharmacy technician."  Her argument ignores that the evidence shows that Hebble routinely worked the check-out counter and cash register with a ready view of Gulf Coast's customers, and she spoke over the phone with underground market participants including drug dealers and suspect clinics.  Hebble also actively solicited business from some of the suspect clinics, such as CMG and Physicians Wellness Center, that directed customers toward Gulf Coast.  Hebble (together with Green) also benefited substantially from the proceeds of Gulf Coast's business.  Hebble's separate sufficiency arguments are unavailing.

In the face of abundant mens rea evidence, the defendants also argue that the government was required to show and failed to show that either defendant knew that any particular prescription was written outside the usual course of professional practice and for other than legitimate medical purposes.  That argument mistakes the nature of the crime charged in this case.  Defendants Green and Hebble were

charged with one count of conspiracy to distribute; their indictment did not include individual distribution counts for specific transactions.  The conspiracy crime for which they were charged was the making of an agreement and the knowing and voluntary participation in that agreement to avail themselves of a lucrative illegal controlled substance underground market, not for any single drug transaction in which they engaged.  See Westry, 524 F.3d at 1212.  There was plenty of evidence that the defendants knew they were dispensing and distributing controlled substances in large quantities to a customer base that included numerous drug dealers and consumers who used these drugs illegally.  That evidence was sufficient to sustain their convictions.

## C.    Conspiracy to Commit Money Laundering and Substantive Counts

The defendants challenge the sufficiency of the evidence supporting their convictions for the remaining counts, including one count for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and multiple substantive counts of money laundering for individual monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2.  Both defendants were co-owners and cosigners on Gulf Coast's bank accounts.

The defendants did not make a general challenge to the sufficiency of the evidence supporting their money laundering convictions.  Rather, they made specific challenges, which were the same as their challenges to the drug

distribution conspiracy convictions, primarily that they did not knowingly fill illegal prescriptions. In turn, they assert that because they did not participate in any unlawful prescription activity, they did not know the money they deposited were proceeds of unlawful activity.[14] As explained above, sufficient evidence showed the defendants knowingly participated in an illegal drug distribution conspiracy, and thus their same arguments fail here too.

Further, for the first time on appeal, the defendants raise additional specific challenges to their money laundering convictions on the grounds that the government failed to prove (1) the money deposited into various bank accounts were actually the proceeds of their illegally distributing controlled substances as opposed to proceeds from other legitimate business of the pharmacy, and that (2) Hebble knew this fact. "When a defendant raises specific challenges to the sufficiency of the evidence in the district court, but not the specific challenge he tries to raise on appeal, we review his argument for plain error." United States v. Baston, ___ F.3d ___, Nos. 14-14444, 15-10923, 2016 WL 1162202, at *8 (11th

---

[14]In the district court, the defendants' Rule 29 joint motion for judgment of acquittal argued:

> In this case, we have one conspiracy to distribute drugs, one conspiracy for money laundering, and substantive money laundering counts. I'm not going to spend any time on the money laundering issue because, if the Count 1 conspiracy falls, I believe that the remaining money laundering counts would have to fall, because they depend upon the funds that are at issue in the money laundering counts having been generated by specified unlawful activity, that specified unlawful activity is the Count 1 conspiracy to distribute drugs.

44

Cir. Mar. 24, 2016).  In this case, we readily conclude their arguments lack merit under both plain error and de novo review.

18 U.S.C. § 1957 provides a criminal penalty when one "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a).  In turn, 18 U.S.C. § 1956(h) provides that "[a]ny person who conspires to commit any offense defined in . . . section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."  18 U.S.C. § 1956(h).

At trial, overwhelming evidence showed that Gulf Coast brought in millions of dollars from drug sales, most of which came from selling oxycodone.  In 2010, Gulf Coast purchased almost 1.5 million oxycodone pills from distributors for retail sale.  In 2011, it purchased over 2 million pills.  In turn, Gulf Coast then sold these pills either by the pill or in set quantities to its customers.  Gulf Coast employees testified that Gulf Coast charged between $250 and $500 per oxycodone prescription, or $800 to $900 per prescription for the name brand Roxicodone.  Gulf Coast refused to take insurance for oxycodone (though it took insurance for other medications).  Notably too, most customers paid in cash. Indeed one employee testified that Gulf Coast took in between $15,000 and

$28,000 in cash per register per day. A jury could readily and reasonably conclude that most of that cash income was due to the illicit oxycodone sales.

Gulf Coast's utilization record from October 2010 illustrates one month's oxycodone output. That month, Gulf Coast filled over 900 oxycodone 30 mg prescriptions and over 585 oxycodone 15 mg prescriptions for a total of 1,485 oxycodone prescriptions. Those 1,485 prescriptions accounted for 212,000 oxycodone pills. To use the most conservative of price figures presented at trial, if Gulf Coast charged just $250 per prescription in October 2010, then Gulf Coast would have brought in $371,250 in oxycodone sales alone for that month. That means Gulf Coast charged on average $1.75 per pill.

That $1.75-per-pill figure is fully consistent with Gulf Coast's prices over a year later on the day the DEA raided the pharmacy. That day, Gulf Coast was charging $1.50 per 15 mg pill of oxycodone and $2.00 per 30 mg pill. In 2011, Gulf Coast purchased over 2 million oxycodone pills from distributors for sale, and a reasonable juror could conclude that Gulf Coast apparently sold most of them since Gulf Coast frequently experienced supply shortfalls near the end of the month. If Gulf Coast sold those 2 million pills for an average price of $1.50-per-pill, that easily accounts for the $3,000,000 that was deposited into one of Gulf Coast's bank accounts in 2011. Only defendants Green and Hebble had signing authority over that bank account.

And only defendants Green and Hebble had signing authority over another bank account into which a significant portion of that money was transferred before being spent on various items. The indictment included money laundering counts for six transactions in 2011 totaling $402,599.18. Only $60,000 of that money or 14.9% needed to be proceeds of illegal drug distribution to sustain the money laundering counts and the money laundering conspiracy count predicated on these six transactions.

The jury heard one of Gulf Coast's pharmacists admit that approximately 90% of the prescriptions Gulf Coast filled were for oxycodone. The jury could reasonably have inferred that 90% of the $402,599.18 covered by the indictment was due to oxycodone sales, a percentage far greater than 14.9%. And on that basis, in combination with the overwhelming evidence of underground market oxycodone activity presented at trial and the defendants' participation in that underground market activity, the jury could reasonably find that the defendants money laundered proceeds of illegal drug distribution for the statutory dollar amount minimum on the six occasions covered by the indictment and conspired with each other to do so.

Defendant Hebble's individualized sufficiency arguments are without merit. As Hebble concedes, the evidence showed that: (1) Hebble's managerial role at Gulf Coast made her responsible for handling the pharmacy's financial records,

47

receipts, tax returns, and other such records; (2) she regularly personally deposited Gulf Coast's revenues into Gulf Coast's bank account; and (3) she in turn was one of the principal beneficiaries of Gulf Coast's profits along with defendant Green. Abundant evidence inculpated her rather than exculpated her from the money laundering scheme.

In sum, the evidence was amply sufficient to sustain the defendants' convictions even under <u>de novo</u> review, much less plain error review.

## IV.  MOTION TO SEVER

Defendant Hebble appeals the district court's denial of her pre-trial motion to sever as well as her renewed motion at the close of the government's case. Hebble argues that had she and defendant Green been tried separately, Green would have testified at her trial and would have exonerated her.

### A.    Severance Law

A defendant arguing for severance to permit a codefendant's exculpatory testimony must demonstrate: "(1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the co-defendant would indeed have testified at a separate trial." <u>United States v. Novaton</u>, 271 F.3d 968, 989 (11th Cir. 2001).  If the defendant makes this showing, then, to determine if severance is warranted, the district court must: "(1) examine the significance of the testimony in relation to the

defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion." Id.

We review the district court's denial of a motion to sever for abuse of discretion. See United States v. Liss, 265 F.3d 1220, 1227 (11th Cir. 2001). Because "appellate courts are reluctant to second-guess trial court refusals to grant a severance, . . . to show an abuse of discretion, a defendant must satisfy the heavy burden of demonstrating compelling prejudice from the denial of a motion to sever." Novaton, 271 F.3d at 989 (quotation marks and alterations omitted).

In reviewing the district court's severance ruling, we "have often looked hard at the substance of the affidavits proffered by the co-defendant who purportedly would testify in a separate trial." Id. "[S]tatements concerning the testimony that would become available by severing trials must be specific and exonerative, rather than conclusory or self-serving, in order to justify severance." Id. at 990. And a codefendant's proffered testimony in favor of the moving defendant is of "dubious credibility" when "it was in no way contrary to the [codefendant's] own interests." United States v. Pepe, 747 F.2d 632, 651 (11th Cir. 1984).

49

**B.    Analysis**

In support of her pre-trial motion to sever, defendant Hebble submitted an affidavit by defendant Green in which he asserted that if "HEBBLE's trial [were] held separately and subsequently from [his], [he would] be available to take the stand as a defense witness on Ms. HEBBLE's behalf."  While Green stated he was "willing to testify" for Hebble, he conditioned his willingness on his being "allowed to proceed to trial first, so that the testimony [he would give] on Ms. HEBBLE's behalf [could not] be used against [him] at [his] own trial."

Turning to the substance of his proffered testimony, Green described his close association with Hebble, largely stressing his "unique position to provide exculpatory testimony" for Hebble but without specifically stating what that exculpatory testimony was.  Green stated:

> During this 2009 through 2011 time period, my codefendant, Ms. HEBBLE, was employed by Gulf Coast Pharmacy as an office manager.  In addition, during the same time frame, Ms. HEBBLE and I became engaged to be married.  We resided together in a home that I owned during this time.  Because of our shared personal and professional lives, I am in a unique position to provide exculpatory testimony on Ms. HEBBLE's behalf.  As both Ms. HEBBLE's employer and her fiancé, I spent nearly all my time in her company. In my role as her employer, I know better than anyone else what her duties and responsibilities at Gulf Coast Pharmacy entailed; I had, in essence, assigned those duties and responsibilities to her.  Even more crucially, as her fiancé, I am alone in a position to testify to facts that would establish Ms. HEBBLE's innocent state of mind; no other potential witness could possibly testify as to many of these facts, since those facts relate to matters that occurred when Ms. HEBBLE and I were alone.

In addition, based on my review with counsel of the discovery provided by the prosecution, we are aware of the likely identities of some of the persons the government will call as prosecution witnesses against Ms. HEBBLE at trial. I am in a position to provide Ms. HEBBLE's defense with testimony that will contradict and impeach the testimony of these witnesses. In many instances, I had a unique vantage point to see Ms. HEBBLE's interactions with these potential government witnesses and, thus, to establish her innocence to the charges brought against her in this case.

The district court ruled that neither Hebble's severance motion nor Green's affidavit satisfied the legal standards that warrant severance.

At trial, Hebble renewed her severance motion at the close of the government's case.[15] Hebble argued that if the trials were severed at that point, Green would be in a position to refute testimony that several government witnesses had given. Hebble alleged that Green would testify (1) that Hebble had not given recycled pills to drug dealer Christopher McNaughton without his having a prescription in hand, and (2) that Hebble had not seen news reports of drug dealer David Massey's arrest. Regarding the McNaughton sale, Green would explain that he had reviewed Gulf Coast's records and this incident could not have occurred without his knowledge. Regarding Hebble's seeing news of Massey's arrest, Green would explain that he and Hebble had been "spending all their time

---

[15]Out of caution, the government concedes that we also may consider any specific, exonerative facts Hebble proffered at the time of her renewed severance motion that were not included in Green's affidavit submitted with Hebble's pretrial severance motion. See Byrd v. Wainwright, 428 F.2d 1017, 1019 (5th Cir. 1970).

51

together" and had been watching the same news broadcasts.  Since Green and Hebble had not discussed the Massey news story together, she must not have seen it.  The district court again denied Hebble's motion to sever.

We conclude that defendant Hebble has come nowhere close to showing that the district court abused its discretion in denying her severance motion.  As to several aspects of Green's proffered testimony, Hebble did not show a "bona fide need for the testimony."  Novaton, 271 F.3d at 989.  Other witnesses could readily have provided testimony that Green could have provided.  Hebble could have explored the contents of Gulf Coast's records through the testimony of other employees who worked at Gulf Coast, and many of these employees could likewise have testified regarding Hebble's duties and responsibilities at Gulf Coast.

Hebble also failed to identify the substance of the desired testimony.  Id.  In his affidavit, Green asserted that he was "in a position to testify to facts that would establish Ms. HEBBLE's innocent state of mind," but he did not identify what those facts were.  Even where Green asserted that he would provide testimony that would contradict and impeach government witnesses, he did not say what that testimony was.  At most, Green's proposed testimony as to various government witnesses amounted to bare conclusory assertions that the events those witnesses described did not happen.   Bare assertions that a codefendant knows substantive facts are not themselves substantive facts.

Hebble also did not show the "exculpatory nature and effect of the desired testimony." Id. Green's assertion that he was in a "unique position" to provide exonerating evidence given Green and Hebble's close relationship does not necessarily suggest his testimony would indeed be exonerating. Since Green and Hebble were charged with conspiring together, a jury could reasonably find their close relationship to be a fact that inculpated Hebble rather than exculpated her. We also note that nothing Green offered to say on Hebble's behalf was in any way contrary to Green's own interests. See Pepe, 747 F.2d at 651. In essence, Green's proffered testimony was no different than claiming that neither he nor Hebble had conspired to distribute controlled substances illegally. Green's conclusory and self-serving proffered testimony is not the kind of testimony that warrants severance. See Novaton, 271 F.3d at 989.

In sum, the facts of this case only reaffirm the "well-settled principle that it is preferred that persons who are charged together should also be tried together, particularly in conspiracy cases." United States v. Smith, 918 F.2d 1551, 1559 (11th Cir. 1990) (quotation marks omitted). We do not find that the district court

abused its discretion in denying Hebble's severance motions.[16]

**AFFIRMED.**

---

[16]The defendants also challenge the district court's denial of their post-trial motion requesting the court to dismiss the indictment for selective prosecution, in violation of the Fifth Amendment's Due Process Clause.  The defendants acknowledge that they did not timely raise this claim before trial as they were required to do,  see United States v. Scrushy, 721 F.3d 1288, 1305-06 (11th Cir. 2013), but they assert their delay was excused because the evidence on which to base their claim did not arise until mid-trial and alternatively their trial counsel was ineffective.

Assuming without deciding that the defendants showed cause for not timely raising their selective prosecution claim and that the issue is properly before us on the merits, we find the defendants' claim wholly without merit.

54