[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16507

_____

D.C. Docket No. 1:15-cr-20241-JLK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE LUIS MORALES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 29, 2018)

Before ED CARNES, Chief Judge, MARCUS, Circuit Judge, and ROSS,[*] District
Judge.

_____

[*] Honorable Eleanor Louise Ross, United States District Judge for the Northern District
of Georgia, sitting by designation.

ED CARNES, Chief Judge:

Congress has decided that a gun in the hands of a convicted felon is not just bad, but bad enough to be a crime. That legislative decision, coupled with his own bad conduct, proved to have bad consequences for Jose Luis Morales in the form of more than 15 years imprisonment. In this appeal he makes a number of arguments against his conviction and sentence, none of which are good, at least not good enough to prevail.

## I.  BACKGROUND

### A. Facts

One day in December 2014, police received an anonymous tip that a white Hispanic male was selling drugs out of a certain house in Miami Gardens. Over the next few months, police detective Phillip Torres — a twenty-four year law enforcement veteran — was able to link Jose Morales to the man described in the tip.

The neighborhood around the house was experiencing a rash of gun and drug crime. So much so that a gang task force was targeting that area. And it just so happened that Torres was a member of that task force. One night in March of 2015, an officer in an unmarked car was driving through the neighborhood around the house as part of the task force's operations. She saw a Ford Mustang with several people standing around it that was improperly parked outside the same

2

house that Torres had been investigating.  Around ten to twenty members of the task force were called out to the area, including Torres.

When Torres arrived at the house he saw some of the other officers speaking with the men who had been standing by the car.  He recognized one of those men as Morales.  As Torres approached the house, a woman appeared at the front door.  She peeked out to see what was going on and went back inside.  Torres spoke with Morales, who told him that the woman was his girlfriend's mother, Berta Lang, and that she lived at the house with him, his girlfriend, and their young children.

Torres went to the front door of the house and knocked, calling out: "Police!"  According to him, no one answered.  According to Lang, however, she heard the knocking but refused to open the door unless the officers had a warrant.

Torres stopped knocking and talked to his supervisor, who sent him back to the door with another officer who spoke Spanish.  That officer was Sergeant Jorge Rodriguez.  The two went back to the front door and knocked.  After thirty seconds or so, Lang answered the door.  Rodriguez spoke to her in Spanish.  He told her that they were police officers, that there had been a complaint at the house, and that they would like to talk with her about it.  Rodriguez then asked her if they could come inside, which Lang said was okay.

3

She brought them into the living room just inside the door.  Once inside, Rodriguez told Lang that they were "conducting a criminal investigation," and that they were there to get her consent to search the house.  He asked her if she lived at the house, and she responded that she did.  She told him that she was the leaseholder and that her daughter, Morales, and their two small children (Lang's grandchildren) lived there too.  Rodriguez then asked if she had access to the entire house, including her daughter's and Morales' room, and Lang responded that she did.  She told him that she goes in there to clean the room and take care of the kids.  Rodriguez asked if they could search the house.  Lang said that "she d[id]n't know about anybody else" who lived in the house, but that she had "nothing to hide."  Rodriguez explained to her that she had the right to refuse to consent — then or at any point later on — and it was okay if she wanted them to get a search warrant first.  But Lang "insisted" that they could search and repeated that she had nothing to hide.

After Lang gave the officers her verbal consent to search, Rodriguez went outside and told his supervisor, who said they needed her signed written consent before sending the K-9 unit inside.  So Rodriguez took a "consent to search" form inside to Lang.  The form was in English, but Rodriguez translated it into Spanish for her, line by line.  He explained to her (in Spanish) that the form concerned her

4

consent and told her that she had a right to refuse consent and insist on a search warrant.[1]  Lang said it was okay for them to search the house and signed the form.

Lang wasn't handcuffed or otherwise restrained during that conversation or thereafter, and the officers didn't have their guns drawn.  Neither did they yell, threaten, or put any other pressure on Lang to sign the form.  According to the officers, Lang was very "calm" and "professional" when they spoke.  And according to Lang, the officers never threatened her.

Once the consent form had been signed, a dog named "Bond" came in with his handler to search the house.  Bond alerted to the bottom left side of the closet in the Morales' bedroom.  Officers found a red and black striped bag in the closet with a pair of men's boxers and two firearms:  a Rossi .38 caliber revolver (also known as a .38 special) and a .22 caliber pistol.  There were also four .38 caliber bullets loose in the bag that matched the .38 special.  The officers searched the rest of the bedroom and found in the nightstand a letter to Morales with the address of the house on it.  They then arrested Morales.

The officers took Morales to the station for questioning.  Torres and Rodriguez read him his Miranda rights and interviewed him.[2]  Morales

---

[1] In English, the form provides that "[y]ou may refuse to consent to a search and may demand that a search warrant be obtained prior to any search of the premises or vehicle described below."

5

acknowledged that he understood his rights; he signed a <u>Miranda</u> waiver and gave a DNA sample. The interview, all of which was recorded, lasted about thirty minutes, and during it Morales confessed.

Morales confirmed that he had been living in the house for two years and stayed in the room where the guns were found. He admitted that "the two guns are mine" and that everything else that was found in the bag belonged to him. He said that he had found the .38 special by a canal while fishing and had found the .22 caliber pistol in an abandoned house. He brought both of the firearms home without anyone else knowing about it.

When the officers asked him where he had put the firearms when he brought them home, Morales responded that he had put them in the closet inside the red and black bag the officers had found there earlier. He said that both guns were his, that he kept them for protection, and that his family didn't know they were in the house. He admitted that he knew that as a convicted felon he shouldn't have had the firearms, lamenting that "I put myself in this mess."

Morales confirmed to the officers that he was telling the truth, that no one coerced him, and that he had understood all of their questions. He was, he said, "guilty" and "[t]hat's the honest truth."

---

[2] The officers read Morales his <u>Miranda</u> rights after they had already asked him a few questions. They repeated all of their questions after they read him his rights, and Morales' confession occurred after that.

## B. Procedural History

A grand jury indicted Morales on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  He moved the district court to suppress the evidence discovered by the officers during the search of the house, as well as the confession he gave at the station after the search.  His grounds were that Lang did not voluntarily consent to the officer's entry or search of the house, and that the officers were required to also ask him for his consent.  Morales contended that as a result, the firearms and his confession should be excluded as the result of an illegal search.

After an evidentiary hearing on the motion to suppress, a magistrate judge issued a report recommending that the motion be denied.  It found that Lang had refused to open the door when Torres first approached the house, and it was only when he returned with Rodriguez and announced their presence as police officers that Lang opened the door.  It also recognized, however, that Lang was entitled to "stand on her constitutional right[ ]" not to answer the door without a warrant, and that the second attempt to talk with her amounted to an indirect command to open the door.  The report recommended that the court rule that Lang had not voluntarily consented to let the officers into the house but instead had acquiesced to their "aura of officialdom," and that the district court find that the officers' entry into the house was a Fourth Amendment violation.  But it also recommended that the court

conclude that Lang's consent to search the house was voluntary and served as an intervening event that purged the taint from the illegal entry. And because Lang had authority to consent to a search on her own, the report recommended that the district court rule the search valid, even though the officers did not attempt to seek consent from Morales. Over Morales' objections, the district court adopted the magistrate judge's report and recommendation and on the basis of it denied the motion to suppress.

A two-day jury trial followed. Morales stipulated at trial that he was a convicted felon; that his rights to possess a firearm had not been restored; and that the two guns had traveled in interstate commerce. The only issue at trial was whether Morales possessed the guns. At the end of the government's case, Morales moved for a judgment of acquittal, but the district court denied the motion. The court determined that there was sufficient evidence in the record for a jury to convict Morales. And that is what the jury did. Following the trial, Morales again moved for a judgment of acquittal, and the district court again denied that motion.

Because Morales had at least three prior convictions for serious drug offenses he qualified as an armed career criminal under the Armed Career Criminal

Act, 18 U.S.C. § 924(e).[3]  The presentence investigation report concluded that

Morales qualified for an enhanced sentence under United States Sentencing

Guideline § 4B1.4.  The result was a total offense level of 33 and an elevated

criminal history category of IV, which produced a guidelines range of 188 to 235

months.  U.S.S.G. § 4B1.4.  Under § 924(e)(1), the statutory minimum penalty was

15 years (180 months) imprisonment and the statutory maximum was life

imprisonment.

Morales objected to the presentence report on the grounds that the enhanced

sentence under § 924(e) and U.S.S.G. § 4B1.4 would result in a violation of his

Eighth Amendment right to be free from cruel and unusual punishment.  He

reiterated that objection at the sentence hearing.  But the district court overruled it

and adopted the PSI calculations.  After stating that it had considered the factors

listed in 18 U.S.C. § 3553(a), the court sentenced Morales to 188 months

imprisonment followed by a three year term of supervised release.

On appeal Morales contends that the district court erred by denying his

motion to suppress.  He also challenges his conviction and sentence on other

grounds.

---

[3] Specifically, Morales was convicted in 2008 on four counts of possession with the intent to distribute cocaine, two counts of drug possession, and one count of cocaine trafficking. Those convictions stemmed from five separate incidents where Morales sold cocaine to undercover officers in 2006 and 2007.

## II. THE MOTION TO SUPPRESS

Morales contends that the district court erred in denying his motion to suppress. He argues that the search of the house was illegal because Lang's consent to search was involuntary. He also argues that even if Lang's consent was voluntary, he was a physically present co-occupant who was intentionally denied an opportunity to refuse entry to the officers and to refuse their request to search, in violation of his Fourth Amendment rights.

"A denial of a motion to suppress involves mixed questions of fact and law." United States v. Spivey, 861 F.3d 1207, 1212 (11th Cir. 2017) (quotation marks omitted). We review the district court's factfindings for clear error, construing all the evidence in the light most favorable to the prevailing party — in this case, the government. Id. But we review de novo the district court's application of the law to those facts. United States v. Luna-Encinas, 603 F.3d 876, 880 (11th Cir. 2010). Our review is not moored to the evidence presented at the suppression hearing; we're free to look at the whole record. United States v. Newsome, 475 F.3d 1221, 1224 (11th Cir. 2007).

### A. Whether Lang Consented To The Search

While the Fourth Amendment prohibits unreasonable searches, "[a] search is reasonable and does not require a warrant if law enforcement obtains voluntary consent." Spivey, 861 F.3d at 1213. Voluntary consent means that the consent to

10

search is "essentially" the "free and unconstrained choice" of the occupant.  United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) (quotation marks omitted).  But beyond that, there is no "neat talismanic definition[ ]" of voluntary consent.  United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).  We look to the specific facts of the case to decide if a person's consent to search was voluntary.  Id.  And like most Fourth Amendment questions, that inquiry is based on the "totality of the circumstances."  Spivey, 861 F.3d at 1213.  In deciding the voluntariness issue, the factors we consider include the "voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found."  Id. (quotation marks omitted).  Even though Lang isn't the defendant in this case, those factors are still helpful here.

Although the district court found that Lang did not voluntarily consent to the officers' initial entry into the house, it determined that her written consent to search (once they were inside the house) was given voluntarily.  Morales does not contend that the officers' illegal entry tainted the validity of Lang's consent to

search.[4]  So we will confine ourselves to whether Lang's consent to the search was voluntary.

The officers didn't use coercive police procedures to obtain Lang's consent. There were only two officers present inside the house:  Rodriguez and Torres. Lang testified at the suppression hearing that they didn't threaten or intimidate her to consent to the search.  And there was no evidence that they did.  They didn't draw their guns.  They didn't yell.  Lang wasn't handcuffed.  And the officers testified that she fully cooperated.  She was, they said, very "calm" and "professional" when she spoke with them.

---

[4] At oral argument, the Court asked Morales' counsel about whether he was arguing that the officer's illegal entry tainted the evidence that followed after Lang consented to the search:

> The Court:  That's the argument that you make.  Two fold.  One, police never asked [Morales] for consent.  Two, [Lang's] consent was not truly voluntary.
>
> Counsel:  Correct.
>
> The Court:  That's the beginning and the end of the argument.  Two fold.
>
> Counsel:  Yes, your honor.
>
> The Court:  You don't make a [United States v.] Delancy, [502 F.3d 1297 (11th Cir. 2007),] taint argument, and come back and say temporality, intervening causation, purpose, exploitation.  None of that's in the [initial] blue brief, right?
>
> Counsel:  No, your honor.
>
> The Court:  Just want to make sure, in fairness, that's not an argument you were raising, although it comes up in response and in reply.
>
> Counsel:  Right.  That's correct, your honor.

Later on, after Morales' counsel stated that he "believe[d] that the district court . . . held that the taint was dissipated," the Court asked him again:  "But you're not arguing that that was error. . . . Do I have that right?"  To which counsel said "[t]hat's right, your honor."

We have taken counsel at his word and will not decide whether Lang's consent to search the house was tainted by the officers' initial illegal entry.  See Sepulveda v. U.S. Atty. Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) ("When an appellant fails to offer argument on an issue, that issue is abandoned.").

The officers also made sure Lang understood that she had the right to refuse consent. Rodriguez, who is fluent in Spanish, explained to Lang twice — first when he got her verbal consent, and then again when he translated that specific right from the written consent to search — that she had the right to refuse consent. For good measure, he told her that it was okay if she wanted to wait for the officers to get a warrant. But Lang "insisted" that they could search the house. And she said, multiple times, that although "she d[id]n't know about anyone else" in the house, she had "nothing to hide." As Morales himself conceded to officers later that night, Lang wouldn't have had any reason to believe the guns were there.[5] That is yet another factor in favor of voluntariness. Id.

After it considered all of the circumstances, the district court correctly determined that Lang's consent was voluntary. The officers made sure that Lang understood her rights. She knew she had a right to refuse consent, but significantly, Lang said she had "nothing to hide." Considering that, it is clear that the district court did not err in finding that Lang intelligently and voluntarily gave her consent to search the house.

---

[5] Lang admits that she signed the consent form. But at the suppression hearing she testified that she didn't know what the form said or that it was about a search. According to her, she signed it because she was "very nervous" and thought there was nothing in the house. If Lang thought that the officers weren't going to find anything in the house, then she knew that the form was about a search of the house, notwithstanding her previous denials of that fact.

B. <u>Whether Lang Had Authority to Consent Without Morales' Consent</u>

Of course Lang's consent to search, even if voluntary, isn't valid unless she had the authority to do so. See <u>Georgia v. Randolph</u>, 547 U.S. 103, 109, 126 S. Ct. 1515, 1520 (2006) (explaining that a warrantless search is constitutional if it is done "with the voluntary consent of an individual possessing authority"). To be clear, Morales doesn't argue that Lang lacked the authority to consent. He argues instead that, even if Lang's consent was voluntary, the district court erred in denying his motion to suppress because he was a physically present co-occupant who was intentionally denied an opportunity to refuse the officers' entry and search. The government responds that it is enough that the officers received consent to search the house from Lang, who was a co-occupant with common authority over and access to the house, including Morales' bedroom. According to the government, the officers' failure to ask Morales whether he consented to the search didn't render the search illegal because Morales, though detained nearby, failed to object.

When a shared dwelling is involved, co-occupants can generally give valid consent to a search if that person has "joint access or control" over the area. <u>United States v. Matlock</u>, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 993 n.7 (1974). Or in other words, the co-occupant has "the right to permit the inspection in his own right." <u>Id.</u> If the police reasonably believe that the co-occupant "possessed

14

authority over the premises" at the time of entry, then the co-occupant's consent to search is valid. United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008). But the consent of one co-occupant to search can't trump the express objection of another physically present co-occupant. Randolph, 547 U.S. at 120, 126 S. Ct. at 1526.

Of course, if the person who would refuse consent isn't present or doesn't object, then the consent of the co-occupant who is there is good as against the absentee or silent co-occupant. Matlock, 415 U.S. at 170–71, 94 S. Ct. at 992–93. And a warrantless search based on that consent is constitutional. Id. For example, in Matlock, the defendant was arrested outside of his house that he lived in with his girlfriend. Id. at 166, 94 S. Ct. at 991. He was placed in a nearby squad car. Id. at 179, 94 S. Ct. at 997. The arresting officers didn't ask the defendant for consent to search the home; they asked his girlfriend, who was inside the house and allowed them to search. Id. The search that followed resulted in evidence that the defendant later sought to suppress on Fourth Amendment grounds. Id. at 166–67, 94 S. Ct. at 991. The Supreme Court held that the consent of the girlfriend was valid against the defendant, even though the defendant wasn't asked for his consent. Id. at 170–71, 94 S. Ct. at 993.

Morales asserts that this case is more akin to Randolph, where the defendant was physically present at the door and expressly refused consent to search his

house, while the defendant's estranged wife, who was also there, did consent to the search. 547 U.S. at 107, 126 S. Ct. at 1519. According to Morales, because he was a physically present co-occupant, the Randolph decision required that the officers ask him for his consent to enter and search the house.

First, unlike Randolph, Morales was not present at the door when the officers spoke with Lang. And he never refused consent. The Supreme Court "dr[ew] a fine line" in Randolph, distinguishing that case from Matlock based on those very factual differences:

> [I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out . . . [s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection . . . .

Randolph, 547 U.S. at 121, 126 S. Ct. at 1527. "Although the Matlock defendant was not present with the opportunity to object, he was in a squad car not far away." Id. Same here. Morales was not involved in the conversation between the officers and Lang but was outside the house "not far away." Id. And even though he asserts that he was "intentionally" kept away, there is no evidence to support that; there is nothing to indicate that the officers removed Morales from the entrance so that he could not refuse consent to search. He was instead out by the car from the time the officers drove up. In Randolph's terms, he was nothing more than a

16

"potential objector, nearby but not invited to take part . . . ."  Id.; see also

Fernandez v. California, 571 U.S. 292, 303, 134 S. Ct. 1126, 1134 (2014) (holding

that an occupant who is absent from the entrance of a home "due to a lawful

detention or arrest stands in the same shoes as an occupant who is absent for any

other reason").

Had Morales objected to the search, it might be different.  Cf. Randolph, 547

U.S. at 121, 126 S. Ct. at 1527.   But he didn't.  And his failure to do so rests on

him.  Cf. L'Amoreux v. Vischer, 2 N.Y. 278, 281 (1849) ("[A] man who does not

speak when he ought, shall not be heard when he desires to speak.").  Despite

Morales' assertions, the officers didn't have a duty to ask him whether he objected

to the search any more than the officers in Matlock had a duty to ask that

defendant.  See Randolph, 547 U.S. at 121, 126 S. Ct. at 1527; Matlock, 415 U.S.

at 170–71, 94 S. Ct. at 993.

Lang's consent was enough to allow the officers to search the house.

Randolph, 547 U.S. at 121–22, 126 S. Ct. at 1527.  She told Rodriguez that she

lived at the house and that she had access to the entire house, including Morales'

bedroom.  And she said that she went in there to clean the room and take care of

the kids.  So it was reasonable for the officers to believe that she had enough

common authority over the house (and Morales' bedroom in particular) to give

valid consent to search.  See Mercer, 541 F.3d at 1074; Matlock, 415 U.S. at 170–

17

71, 94 S. Ct. at 993.  The district court did not err in denying the motion to suppress.

### III.  SUFFICIENCY OF THE EVIDENCE

Morales also contends that the district court erred in denying his motions for judgment of acquittal because the evidence at trial was insufficient to support his conviction.  His main argument is that the government did not present enough evidence to corroborate his confession.  According to him, the government failed to present evidence that he had actual, constructive, sole, or joint possession of the guns; he says that it only presented evidence of his presence in the area of the guns, which according to him is not enough.

We review de novo a challenge to the sufficiency of the evidence.  United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011).  "We view the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor," and we will affirm a conviction if, based on that evidence, a reasonable jury could have found the defendant guilty beyond a reasonable doubt.  Id. (quotation marks and alterations omitted).

It's true that a defendant's uncorroborated confession is not enough to support a conviction.  Smith v. United States, 348 U.S. 147, 152, 75 S. Ct. 194, 197 (1954).  The government must introduce substantial independent evidence to establish the trustworthiness of the confession, Opper v. United States, 348 U.S.

18

84, 93, 75 S. Ct. 158, 164 (1954), but that evidence itself doesn't have to "prove the offense beyond a reasonable doubt, or even by a preponderance," Smith, 348 U.S. at 156, 75 S. Ct. at 199. It's sufficient for the corroborating evidence to support the defendant's confession enough to "justify a jury inference of [its] truth." Opper, 348 U.S. at 93, 75 S. Ct. at 164. And if the corroborating evidence, along with the confession, establishes guilt beyond a reasonable doubt, the conviction will be upheld. Id. at 93, 75 S. Ct. at 164–65.

Morales stipulated that he was a convicted felon and that the guns traveled in interstate commerce. As a result, possession was the only issue at trial.[6] "Possession" under § 922(g)(1) includes constructive possession. United States v. Perez, 661 F.3d 568, 576 (11th Cir. 2011). So Morales could be convicted of § 922(g)(1) if he was aware of the gun's presence and had the ability and intent to exercise dominion and control over it then or later. Id.

Morales told the officers that he found both of the guns; he brought them into the house; and he placed them inside the closet in his bedroom in the very bag where the guns were later found. There was enough evidence at trial to corroborate that confession. The government introduced the guns, ammo, and bag into evidence, and Torres testified that they were found in Morales' bedroom closet

---

[6] See United States v. Jernigan, 341 F.3d 1273, 1279 (11th Cir. 2003) (explaining that the elements to sustain a conviction under 18 U.S.C. § 922(g)(1) are that (a) the defendant is a convicted felon, (b) who was in the knowing possession of a firearm, (c) that had traveled in interstate commerce).

on the night of the search.  Torres also testified that he found a pair of men's

boxers in the bag and a letter to Morales (with the house's address on it) in the

room.

That evidence, along with Morales' confession, is enough for a jury to find

beyond a reasonable doubt that Morales had knowing and constructive possession

of the guns.[7]  See Perez 661 F.3d at 576.  As a result, the district court did not err

in denying Morales' motion for judgment of acquittal.[8]

## IV. CHALLENGES TO THE SENTENCE

Morales also raises two challenges to his sentence.  He first contends that the

application of the armed career criminal enhancement under 18 U.S.C. § 924(e)

and U.S.S.G. § 4B1.4 violated his Eighth Amendment right to be free from cruel

and unusual punishment.  But "it is well-settled law that a longer sentence may be

imposed on a recidivist, based on his criminal history, even if the offense of

conviction is relatively minor in nature."  United States v. Lyons, 403 F.3d 1248,

---

[7] Morales also argues that there was insufficient evidence to show that he knowingly possessed the guns because there was no DNA evidence that tied him to them.  Although expert testimony adduced at trial showed that there was DNA from more than one person on the .38 special, that testimony did not exclude Morales.  And as a result, the jury could have reasonably inferred that Morales jointly possessed the guns with someone else, or that it was the DNA of whoever owned the guns before he found them.  Either way would establish Morales' possession for the purposes of § 922(g).  See Perez, 661 F.3d at 576–78 (explaining that possession may be joint or sole).  And the fact that he found them isn't a defense to a possession charge anyway.

[8] In the standard of review section of his initial brief, Morales makes reference to appealing the denial of his motion for a new trial, but he never otherwise references an argument appealing the denial of that motion.  So that argument is abandoned.  See Jernigan, 341 F.3d at 1283 n.8 (explaining that a defendant abandons an issue to which he merely makes a passing reference and fails to develop any argument).

1256–57 (11th Cir. 2005) (rejecting an Eighth Amendment challenge to a 235-month sentence, which was imposed for violating § 922(g)(1) and then enhanced by § 924(e) and U.S.S.G. § 4B1.4).[9]  And possession of a firearm by a convicted felon is not a crime that is "relatively minor in nature."

Morales also says that his sentence is substantively unreasonable.  He mentions that potential argument in his headings and statement of the issues but he otherwise gives a single conclusory sentence at the end of his brief without any supporting arguments or authority.  As a result, any challenge to the substantive reasonableness of his sentence is abandoned.  See Jernigan, 341 F.3d at 1283 n.8.

## V.  CONCLUSION

For the reasons set out above, we find no error in the district court's denial of Morales' motion to suppress, in its denial of his motions for judgment of acquittal, or in the sentence that it imposed.

**AFFIRMED.**

---

[9] In his reply brief, Morales argues (without citing any authority) that the prior panel precedent rule doesn't apply to sentencing cases due to the need for individualized sentencing. That out-of-the-blue argument is without any support in the law.  See generally United States v. Steele, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc) ("Under our prior precedent rule, a panel cannot overrule a prior one's holding . . . ."); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) ("The law of this [C]ircuit is 'emphatic' that only the Supreme Court or this [C]ourt sitting en banc can judicially overrule a prior panel decision.").