[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-14576
Non-Argument Calendar

_____

D.C. Docket No. 2:19-cr-00130-MHT-SMD-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BOBBY LEE WILSON, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(September 30, 2021)

Before WILSON, ROSENBAUM, and LAGOA, Circuit Judges.

PER CURIAM:

Bobby Wilson, Jr., appeals his convictions for possession with intent to distribute 50 grams or more of methamphetamine, possession of a firearm by a convicted felon, and possession of a firearm in furtherance of a drug-trafficking crime. He argues that the district court erred in denying his motion for a judgment of acquittal because the government did not present sufficient evidence for a reasonable jury to conclude that he possessed with intent to distribute over 50 grams of methamphetamine, possessed a firearm as a convicted felon, or possessed a firearm in furtherance of drug trafficking. For the reasons discussed below, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Wilson was arrested on April 19, 2019, and, in a superseding indictment, a grand jury charged Wilson with the following: (1) possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count 1); (2) possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count 2); (3) possession of a firearm in furtherance of a drug-trafficking crime, specifically, Counts 1 and 2, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 3); and (4) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count 4). Wilson pleaded not guilty, and the case proceeded to trial.

2

At trial, the government first called Steven Brock, a narcotics investigator for the Chilton County Sheriff's Department, who testified as follows. Brock was initially made aware of Wilson through a confidential informant in early 2018, when Brock was working with the Elmore County drug task force. He began surveillance of Wilson in areas he was known to visit, including a storage facility where Wilson and another individual, Richard Wilson ("Richard"), were known to rent a unit. Wilson and Richard were not related. Brock saw Wilson come in and out of the storage building several times every day or every other day. When Wilson came to and from the storage building, he drove multiple vehicles, including a Chevrolet pickup truck, a maroon Cadillac, and a maroon Buick Riviera. At one point, Brock saw Wilson leave the storage building pulling a camper trailer and determined that Wilson took it to an area called Lucky Town. He observed Wilson driving the Cadillac and the Buick to and from Lucky Town. And he identified the Buick in which he had seen Wilson traveling.

Brock testified that, on April 4, 2018, he installed a GPS tracking device on the Buick, pursuant to a warrant. With the tracking device, Brock and his agents were able to see the location of the Buick in real time through a computer program, and Brock received a notification whenever the car was moving. On April 20, 2018, he and Agent Casey Shaw were surveilling the Buick, which was in the Key West Inn parking lot, from roughly fifty or sixty yards away, but Brock did not see Wilson

3

get in the Buick. After watching the Key West Inn parking lot for about fifteen or twenty minutes, however, he saw Wilson traveling northbound on U.S. 231 in a black Lexus that Brock had never seen before and that had not left from the Key West Inn. Brock was fifteen to twenty feet away from the lane that the Lexus was in when it passed him. Wilson was driving, and someone else was in the passenger seat, but Brock could not tell who it was. Brock decided to conduct a traffic stop because he knew that Wilson did not have a valid driver's license. Once Wilson pulled over about two miles down the highway, Shaw approached the driver's side, while Brock approached the passenger side of the vehicle, where he saw a woman. He smelled marijuana and saw a marijuana cigar in the ashtray of the car. Shaw also smelled marijuana and told Wilson to step out of the car.

As Brock asked for the passenger's driver's license, Shaw attempted to pat Wilson down, but Wilson ran out into the inside lane of U.S. 231. Brock and Shaw grabbed Wilson and attempted to subdue him, during which time Wilson kept trying to reach into his right front pocket. He thought Wilson may have been reaching for a gun. After detaining Wilson, Brock patted him down and recovered a meth pipe and a plastic bag containing a substance that appeared to be meth. A laboratory found that the substance was meth and weighed approximately 38.4 grams. Shaw found a room key in Wilson's back pocket for the Key West Inn where the Buick was found. Brock explained that, in his experience as a narcotics investigator over

4

two decades, it was common for people involved in drug trafficking to carry firearms to protect themselves and their narcotics.  And Brock stated that Wilson had money in his wallet found in the car on the day he was arrested.

On cross-examination, Brock testified as follows.  The storage building place was significant because Wilson and Richard were selling meth from the storage units, although he did not execute a search warrant at that place or make any arrests there.  The day he saw Wilson in the Buick, Brock and his agents were conducting a controlled buy in Lucky Town from him.  The Buick turned out to be registered to Richard, and none of the vehicles that Brock observed Wilson drive were registered to him, although Brock had seen Wilson driving the Buick from time to time and Richard driving the Cadillac a couple of times.  The Buick had not just arrived at the Key West Inn on April 20, 2018; it had been sitting there for a while.  During the twenty minutes when Brock watched the Buick, there was "a female sitting in the vehicle," and he did not see her get in or out of the car.  Wilson's passenger in the Lexus was charged with possession of marijuana, and Brock did not believe she gave a statement to law enforcement.  Brock did not personally search the Buick and did not investigate if a room at the Key West Inn was associated with the room key found on Wilson or when it had been used.  Brock turned the room key over to other agents.  Brock stated that he was the main officer on the case.  He collected and preserved all the evidence from the Lexus, and all the evidence recovered from the Buick was

turned over to him.  He and other agents did not find anything when they searched Wilson's camper.  He never went back and executed a search warrant at the storage building that was part of the earlier investigation.

During redirect examination, Brock testified to the following.  The marijuana blunt had been found in the Lexus's center console, and a jar behind the driver's seat contained marijuana.  The investigators had conducted "controlled buys" from both Wilson and Richard.  Brock had conducted a controlled buy at Lucky Town from Wilson in March 2018, about three weeks before his arrest, and Wilson had arrived, driving the Buick, to the camper.  He never conducted any controlled buys from Wilson at the storage unit.

Next, the government called Shaw, an agent with the Central Alabama Drug Task Force, who testified as follows.  On April 20, 2018, Shaw was investigating Wilson, and he and Brock were surveilling the Buick and expected to see Wilson in or near the vehicle because they believed he was the driver.  Shaw had previously seen, both in person and on video, Wilson with the Buick.  During the surveillance, he and Brock saw Wilson driving northbound on U.S. 231 in a black Lexus.  Shaw's testimony about the traffic stop and the arrest was similar to Brock's.  Before arresting Wilson, the agents conducted controlled buys of crystal meth from him, including one controlled buy where Wilson had driven the Buick to meet an informant.  Crystal meth and a glass pipe were found in Wilson's pocket.  A glass

6

jar with black tape around it and four bags of marijuana inside it were found behind the Lexus's driver's seat in the back floorboard, and Shaw identified the marijuana found at trial. Shaw also identified a magazine for a Cobra .380 firearm that was found in the Lexus, although no gun was found in the car. After Wilson's arrest, Shaw had no further dealings with the Buick found at the Key West Inn. In his experience of more than a decade's worth of narcotics investigations, Shaw often came across a combination of firearms or parts of firearms and narcotics that were being distributed, as narcotics distributors often kept a firearm on their person to avoid being rob.

During cross-examination, Shaw testified to the following. He did not have access to the tracking device on the Buick and did not recall if he saw any activity in the Buick during his surveillance on April 20. He had expected to see Wilson get in the car and be by himself but instead did not see Wilson get in the car that day, nor could Shaw remember the last time he had seen Wilson in the Buick. Wilson was not found in possession of a firearm when he was arrested, although he had illegal drugs on his person. Through the investigation, Shaw never found a .380 firearm, despite finding a .380 magazine.

The government then called Parker Crosby, an agent with the drug task force with the Elmore County Sheriff's Office, who testified to the following. Crosby, who was involved with the surveillance of Wilson, became involved with Wilson's

7

arrest when Brock and Shaw called for assistance on the radio while attempting to arrest him.  Crosby went to the scene, and either Brock or Shaw instructed him to go to the Key West Inn to make contact with the Buick.  Once at the Key West Inn, Crosby saw a woman sitting in the driver's seat of the Buick, with her feet hanging out of the door.  No one else was in the vehicle.  He and another agent made contact with the woman and obtained permission from her to search the Buick.  They discovered a loaded firearm—a Taurus PT-11 9mm handgun—underneath the Buick's driver seat.  They also found a pair of men's Timberland boots in the Buick, and one of the boots contained several bags of meth.  The net weight of the meth was 54.33 grams, while the amount of pure substance was 47.26 grams.  There was also a set of digital scales in the car.

During cross-examination, Crosby testified as follows.  His job in the investigation was just to search the Buick.  He did not personally conduct the search and was unsure if any of the evidence found in the Buick was tested for fingerprints.  There was men's clothing in the backseat of the car.  He did not search the room at the Key West Inn and did not believe it had been searched.  He did not remember if he learned what room the unidentified woman found in the Buick was staying in.  The other agent collected the evidence and turned it over to Brock.

The government then called Brian Alfultis, a special agent with the Drug Enforcement Agency ("DEA"), who testified to the following.  He participated in

8

Wilson's interview at the Elmore County Jail but was not involved with the preceding investigation or arrest. Alfultis took Wilson's statement on April 24, 2018, while Wilson was in jail. Wilson signed a form waiving his *Miranda*[1] rights and agreed to give a statement at that time. During the interview, Wilson said that the meth found in his pocket "belonged to him" and that the meth found in the Buick "belonged to him as well." Wilson also said that he owned two handguns, a 9mm and a .380 caliber, during the interview. Wilson also told them about two people who were "sources of supply for him," both of whom dealt meth. Based on his training and investigation in meth investigation cases, Alfultis believed that the total amount of meth seized from the car and Wilson was 80 or 90 grams, which would be about 160 to 200 individual use amounts of meth. He considered that the amount of meth that Wilson had was a distribution amount of meth, not a personal amount, and noted another indication that someone was distributing meth was the presence of scales to weigh it before selling. During cross-examination, Alfultis testified that Wilson during the interview told them that he had a partner, Richard, with whom he would purchase narcotics. Alfultis did not know if anyone else involved had been arrested or charged, such as the women seen in the cars the day of Wilson's arrest.

Following this testimony, the parties stipulated that Wilson had been convicted of a felony, and Wilson "knew so," and that the Taurus Millennium 9mm

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

handgun named in the superseding indictment had traveled in and affected interstate commerce.  The government then rested its case.

Wilson then moved for a judgment of acquittal, arguing that the government had failed "to prove a prima facie case of the four different, separate crimes. Specifically, the methamphetamine in excess of 50 grams or more."  He asserted that, at best, the government had proven that he was in possession of the 38 grams of meth found in his pocket but not the meth found in the car.  Wilson contended that the government had not proven that he had possessed meth in excess of 50 grams because it had failed to prove that he had constructive possession over, or was responsible for, the meth found in the car.  The government responded that the totality of the evidence supported a finding that Wilson had possessed the meth found in the car, considering that the "car belonged to him," that he was using it, and "his admission to the drugs that were found in it, in addition to the narcotics found on his person."  It argued that he had possessed meth in excess of 50 grams because the meth in his pocket was determined to be 30.3 grams of pure substance and the meth in the Buick came out to 47.26 grams, for a total of somewhere between 77 and 78 grams.

Wilson replied that the government had not proven that he had actually or constructively possessed the evidence in the Buick because he was driving past it when he was arrested and had no intentions of pulling into the Key West Inn.  When

the district court asked if he had not admitted that the drugs were his, he "agree[d] that there was testimony as to an admission." He further argued that the government failed to prove that he intended to distribute the marijuana because the amount did not indicate that it was for distribution. The government responded that it had provided sufficient evidence in the form of the amount of the marijuana and the possession of the scales. Wilson, however, did not make specific challenges to Counts 3 and 4 beyond his general assertion that the government had not met its burden in proving a prima facie case as to those counts.

The district court denied Wilson's motion. Following the motion's denial, Wilson decided not to testify. Wilson also did not present any evidence for his case. The jury subsequently found Wilson guilty on all counts, and as to Count 1, the jury found that he possessed with intent to distribute 50 grams or more of meth. The district court sentenced him to a total sentence of 196 months' imprisonment, to be followed by five years of supervised release. This appeal ensued.

## II.    STANDARDS OF REVIEW

We review the denial of a motion for judgment of acquittal *de novo*. *See United States v. Woodard*, 531 F.3d 1352, 1360 (11th Cir. 2008). Additionally, we "review *de novo* the sufficiency of the evidence supporting a criminal conviction." *United States v. Williams*, 865 F.3d 1328, 1337 (11th Cir. 2017) (quoting *United States v. Walker*, 490 F.3d 1282, 1296 (11th Cir. 2007)). "[W]e consider the

evidence in the light most favorable to the jury's verdict, . . . drawing all reasonable inferences and making all credibility choices in the government's favor," and "will reverse a conviction based on insufficient evidence only if no reasonable trier of fact could have found guilt beyond a reasonable doubt." *Id.* (quoting *Walker*, 490 F.3d at 1296). The evidence need not exclude every reasonable hypothesis of innocence to rebut the government's evidence because the issue is whether a reasonable jury could have convicted, considering all the evidence together, not whether the conviction was the only reasonable result. *See id.* at 1343–44.

We review for plain error when a defendant raises some specific challenges to the sufficiency of the evidence in the district court but not the specific challenges that he then tries to raise on appeal. *See United States v. Baston*, 818 F.3d 651, 664 (11th Cir. 2016); *United States v. Green*, 818 F.3d 1258, 1278 (11th Cir. 2016). The defendants in both *Baston* and *Green* did not raise general challenges to the sufficiency of the evidence supporting their convictions, which we noted both times in our determination of the standard of review. *Baston*, 818 F.3d at 664; *Green*, 818 F.3d at 1278. And, in *Baston*, we declined to address whether a defendant preserves all challenges to the sufficiency of the evidence if he raises a "general" challenge in the district court. 818 F.3d at 663–64. Plain error occurs where there is an error that (1) is plain or obvious, (2) affected the defendant's substantial rights,

12

and (3) seriously affected the fairness of the judicial proceedings.  *United States v. Frank*, 599 F.3d 1221, 1238 (11th Cir. 2010).

## III.   ANALYSIS

On appeal, Wilson argues that the government presented insufficient evidence to prove, beyond a reasonable doubt, that he was in constructive possession of the drugs and firearm that were found in the Buick and that, because the crimes in Counts 1, 3, and 4 required him to be in possession of the drugs and firearm, the district court erred in denying his motion for acquittal and his convictions for those crimes should be reversed.  Viewing all the evidence, and facts and inferences based on that evidence, in the light most favorable to the government, we conclude that the district court did not err in denying Wilson's motion for a judgment of acquittal as to his challenged convictions, addressing each in turn.

### A. Count 1

No individual may knowingly or intentionally possess with intent to distribute a controlled substance.  21 U.S.C. § 841(a)(1).  As relevant here, the mandatory penalty range for violations of § 841(a)(1), if the violation involved more than 50 grams of methamphetamine, is imprisonment for ten years to life, a fine of up to $10,000,000, and supervised release for five years to life.  *Id.* § 841(b)(1)(A).  The mandatory penalty range for violations of § 841(a)(1), if the violation involved more

13

than 5 grams of methamphetamine, is five to forty years' imprisonment, a $5,000,000 fine, and at least four years of supervised release. *Id.* § 841(b)(1)(B).

"[T]o convict a defendant for possession with intent to distribute a controlled substance, the government must prove knowing possession and an intent to distribute." *Williams*, 865 F.3d at 1344 (quoting *United States v. Cruickshank*, 837 F.3d 1182, 1189 (11th Cir. 2016)). "These elements may be proven by circumstantial evidence," and "[p]ossession may be actual or constructive, joint or sole." *Woodard*, 531 F.3d at 1360. Actual possession is established when the defendant has direct physical control over the substance, while the "defendant's constructive possession of a substance can be proven by a showing of 'ownership or dominion and control over the drugs or over the premises on which the drugs are concealed.'" *Id.* (quoting *United States v. Clay*, 355 F.3d 1281, 1284 (11th Cir. 2004)). Additionally, a defendant's intent to distribute may be inferred from the large quantity of narcotics that were seized. *United States v. Tinoco*, 304 F.3d 1088, 1123 (11th Cir. 2002).

Here, viewing all facts and inferences in the light most favorable to the government, we conclude that the government presented sufficient evidence for a jury to reasonably find, beyond a reasonable doubt, Wilson's knowing possession of the meth with intent to distribute, given Wilson's admission, the amount of the meth at issue, and the digital scales found. First, Wilson had actual possession of the

14

38.4 grams of meth found in his pocket because he had direct physical control over it, and Alfultis testified that Wilson, while being interviewed, admitted that the meth belonged to him. *See Woodard*, 531 F.3d at 1360. Alfultis further testified that, during the same interview, Wilson admitted that the 47.26 grams of meth found in the Buick "belonged to him," which constituted direct evidence that he possessed the meth found in the Buick. *See id.*

While Wilson argues that the meth found in the Buick could have belonged to him without having dominion and control over the drugs to establish possession, his admission that the meth found in the Buick belonged to him indicated his knowledge and awareness of its presence, and other circumstantial evidence supported a finding that he possessed the meth and intended to distribute it. *See id.* at 1360–61; *cf. United States v. Ochoa*, 941 F.3d 1074, 1105 (11th Cir. 2019), *cert. denied*, 140 S. Ct. 2553 (2020). Both Brock and Shaw testified that they had seen Wilson with the Buick during their investigation and before the day of the traffic stop. In particular, Brock testified that he had seen Wilson driving the Buick to and from a storage unit and to a controlled buy several weeks before the traffic stop. Furthermore, the agents testified that the Buick was found in the Key West Inn parking lot and that Wilson had a room key for the Key West Inn in his back pocket, supporting a connection between Wilson and the Key West Inn and, in turn, indicating Wilson's connection to the Buick and its contents. Thus, based on the above evidence, a jury could

15

reasonably infer that Wilson had been in the Buick before, including for drug-trafficking-related purposes, and could constructively possess an item found within the vehicle, such as the meth that he ultimately admitted belonged to him.

Additionally, Alfultis testified that the amount of meth Wilson had was a distribution amount of meth, not an amount for personal use, and that another indication that someone was distributing meth was the presence of scales, which was found in the Buick. *See Tinoco*, 304 F.3d at 1123. Alfultis's testimony, which was based on his training and experience as a DEA agent, thus supported a finding that Wilson possessed the meth with the intent to distribute it. We thus conclude that the government presented sufficient evidence for a reasonable jury to find, beyond a reasonable doubt, that Wilson possessed over 50 grams of meth that he intended to distribute, and affirm as to this issue.

### B. Counts 3 and 4

Under 18 U.S.C. § 922(g)(1), it is unlawful for any person who has been convicted of a felony to possess a firearm that has been shipped or transported in interstate commerce. An individual who "knowingly violates" § 922(g) shall be fined, imprisoned, or both. 18 U.S.C. § 924(a)(2); *accord United States v. Innocent*, 977 F.3d 1077, 1082 (11th Cir. 2020). As the Supreme Court clarified in *Rehaif v. United States*, 139 S. Ct. 2191, 2194 (2019), the government, in prosecuting a claim under §§ 922(g)(1) and 924(a)(2), "must show that the defendant knew he possessed

16

a firearm and also that he knew he had the relevant status when he possessed it."
*Accord Innocent*, 977 F.3d at 1082. In turn, under 18 U.S.C. § 924(c)(1)(A), an individual is prohibited from possessing a firearm "during and in relation to" a "drug trafficking crime" or possessing a firearm "in furtherance of any such crime."

Possession of a firearm may be either actual or constructive and likewise may be either sole or joint. *See United States v. Perez*, 661 F.3d 568, 576–77 (11th Cir. 2011); *United States v. Morales*, 893 F.3d 1360, 1371 n.7 (11th Cir. 2018). "Constructive possession of a firearm exists when a defendant does not have actual possession but instead knowingly has the power or right, and intention to exercise dominion and control over the firearm." *Perez*, 661 F.3d at 576. "A defendant's presence in the vicinity of a firearm or mere association with another who possesses that gun is insufficient," but, "at the same time, '[t]he firearm need not be on or near the defendant's person in order to amount to knowing possession.'" *Id.* (quoting *United States v. Wright*, 392 F.3d 1269, 1273 (11th Cir. 2004)). Thus, if the government proves, "through either direct or circumstantial evidence that the defendant (1) was aware or knew of the firearm's presence and (2) had the ability and intent to later exercise dominion and control over that firearm, the defendant's constructive possession of that firearm is shown." *Id.* And we consider the totality of the evidence when evaluating constructive possession. *Ochoa*, 941 F.3d at 1106. For example, in *Ochoa*, we held that the government presented the jury with

17

sufficient circumstantial evidence from which it reasonably could have determined that the defendant knew of the firearm's presence and had the ability and intent to later exercise dominion and control over it because he admitted there was a gun in a drawer in his bedroom, which established his knowledge and awareness of the firearm's presence there. *See id.* at 1105.

As to possessing a firearm in furtherance of drug-trafficking activity, the government must establish that the defendant "(1) knowingly (2) possessed a firearm (3) in furtherance of any drug trafficking crime for which he could be prosecuted in a court of the United States." *United States v. Williams*, 731 F.3d 1222, 1232 (11th Cir. 2013) (quoting *Woodard*, 531 F.3d at 1362). "A firearm is possessed 'in furtherance of' a drug trafficking crime when 'the firearm helped, furthered, promoted, or advanced the drug trafficking.'" *Id.* (quoting *Woodard*, 531 F.3d at 1362). Additionally, "the presence of a gun within the defendant's dominion and control during a drug trafficking offense is not sufficient by itself" to sustain a conviction under § 924(c). *Id.* (quoting *United States v. Timmons*, 283 F.3d 1246, 1253 (11th Cir. 2002)). And we consider the following factors in determining whether the government has established the "in furtherance of": (1) the type of drug activity being conducted; (2) the accessibility of the firearm; (3) the type of firearm; (4) whether the firearm was stolen; (5) whether the possession was legitimate or illegal; (6) whether the firearm was loaded; (7) proximity to the drugs or drug

profits; and (8) the time and circumstances under which the firearm was found. *Id.* For example, in *Williams*, we held that the jury had sufficient evidence to convict the defendant of possession of a firearm in furtherance of a drug-trafficking crime. *Id.* We noted that there was evidence presented that: (1) the drugs obtained from the defendant made it likely that he was a street-level dealer; (2) street-level dealers used handguns like the one that fell out of the defendant's pants to defend their territories from rival drug dealers; (3) the gun was loaded and accessible in the defendant's waistband; (4) the gun's close proximity to the drugs and the drug dealing profits, and (5) the gun was found at a time when the defendant did not expect to be confronted by law enforcement officers. *Id.* at 1232–33.

Turning to the instant case, as to Count 4, we first note that Wilson and the government stipulated to Wilson's felon status, as well as his knowledge of that status. And, although a close call, we conclude that, under either *de novo* or plain error review, *see Green*, 818 F.3d at 1278, there was sufficient evidence for a jury to find that Wilson constructively possessed the firearm found in the Buick, as there is evidence indicating that he was aware of the firearm's presence and had the intent and ability to exercise control over it.

Reviewing the totality of the evidence, Alfultis testified that Wilson admitted to owning both a 9mm firearm and a .380 caliber firearm during his interview. As the record demonstrates, ammunition for a .380 caliber firearm was found in the

Lexus that Wilson was driving, and a 9mm firearm was found in the Buick. While the Buick was not registered to Wilson and Wilson was not driving the Buick at the time of the traffic stop, the government presented the jury with sufficient evidence tying Wilson to the Buick. For example, Brock testified that he had seen Wilson (1) drive that Buick to and from a storage unit, which Wilson and Richard were using to sell meth, several times and (2) use the Buick several weeks prior to the traffic stop during a controlled buy the agents conducted. *See Perez*, 661 F.3d at 576. Shaw similarly testified that he had seen Wilson with the Buick. Wilson also admitted that the meth found in the Buick "belonged to him," which, in light of the agents' testimonies, further supported a finding that he also constructively possessed the 9mm firearm that was found in the same vehicle as the meth. And the agents testified that the Buick was in the Key West Inn parking lot and that Wilson had a Key West Inn room key in his possession, further supporting a connection between him and the Buick. Additionally, Brock testified that individuals involved with drug traffics frequently carried firearms to protect themselves and their illegal narcotics while Shaw testified that he often came across a "combination of firearms or parts of firearms" during narcotics investigations, as narcotics distributors would keep firearms on themselves for their own protection. And while an unidentified woman was in the Buick at the time the firearm was found, constructive possession of a firearm may be joint. *See Ochoa*, 941 F.3d at 1105–06. Therefore, in light of the

20

totality of the evidence, there was sufficient evidence presented for a reasonable jury to conclude that Wilson knew of the presence of the firearm in the Buick and had the ability and intent to later exercise dominion and control over that firearm.

We next turn to Count 3.  While Wilson did not admit knowledge and possession of the specific 9mm firearm found in the Buick and was not seen with a firearm during the controlled buys with the Buick, we similarly conclude that the government presented sufficient circumstantial evidence, when viewed in the light most favorable to the government, for a reasonable jury to conclude, beyond a reasonable doubt, that Wilson knowingly possessed a firearm in furtherance of a drug trafficking crime.  Indeed, the government presented testimony and evidence demonstrating the following: (1) Wilson conducted a controlled buy while using the Buick and was seen driving the Buick numerous times to and from a storage unit he used to sell meth; (2) during the traffic stop, Wilson was found with meth on his person as well as a key to the Key West Inn, at which the Buick was parked; (3) Wilson admitted that the meth found in the Buick belonged to him; (4) a loaded 9mm firearm was also found in the Buick, i.e., in proximity to the meth Wilson admitted belonged to him; (5) Wilson admitted that he owned a 9mm firearm; (6) the amount of meth Wilson admitted belonged to him, accompanied by the presence of the digital scales found in the Buick, was an amount indicating distribution, not personal use; (7) individuals involved in drug trafficking commonly possessing firearms to

21

protect themselves and their contraband; and (8) the illegality of Wilson's possession of a firearm as a convicted felon.

Accordingly, we reject Wilson's challenges to the sufficiency of the evidence for Counts 3 and 4 and affirm his convictions on those counts.

## IV.    CONCLUSION

Because the government presented sufficient evidence for a reasonable jury to find, beyond a reasonable doubt, that Wilson knowingly possessed over 50 grams of methamphetamine with the intent to distribute, knowingly possessed a firearm as a convicted felon, and knowingly possessed a firearm in furtherance of drug trafficking activity, we affirm his convictions.

**AFFIRMED.**